

IN THE EASTERN CARIBBEAN SUPREME COURT
HIGH COURT OF JUSTICE
BRITISH VIRGIN ISLANDS
COMMERCIAL DIVISION



CLAIM NO: BVI HC (COM) 2010/ 107

B E T W E E N:

        Trade and Commerce Bank (In Official Liquidation)
        (a company incorporated in the Cayman Islands)

                                                                                                          **Claimant**

                                              and

        Kesten Development Corporation

                                                                                                         **Defendant**

---

## STATEMENT OF CLAIM

---

1. Trade and Commerce Bank ("**TCB**") is a Cayman Islands company that was placed into liquidation on 29 August 2002 by order of the Grand Court of the Cayman Islands. G. James Cleaver and Richard Fogerty are the Joint Official Liquidators of TCB (the "**Liquidators**"). The Liquidators seek to recover the assets of TCB for distribution in accordance with the statutory insolvency regime of the Cayman Islands.

2. Kesten Development Corporation ("**Kesten**") is a British Virgin Islands company that was incorporated in 1994 and struck from the register in May 2001. On or around 16 August 2010, Kesten was restored to the register.

3. From its incorporation until in or about 1999 Kesten along with its Brazilian parent company Turist-Câmbio Viagens e Turismo Ltd ("**Turist-Câmbio**"), ran an illegal black market money exchange and money laundering business in the United States of America and various countries in South America. During this time, Kesten illegally laundered billions of dollars for various South American smugglers and criminals using its account at MTB Bank in New York, NY.

4. Kesten's money laundering and exchange operation began shortly after Kesten was incorporated in the British Virgin Islands by the opening of an account with MTB Bank in New York named "Venus" with the account number 030-101107 (the "**Venus Account**") on or about 12 July 1995. Kesten used the Venus Account to accept illicitly obtained U.S. dollars from criminals. In exchange for these U.S. dollars, Turist-Câmbio made payments to criminals in local currency as described above. Kesten also used the Venus Account to accomplish the second half of the money laundering operation by wiring payments of U.S. dollars to vendors for goods on behalf of foreign businesses. Those businesses purchased the U.S. dollars by paying local currency to Turist-Câmbio. Kesten was, therefore, able to collect illicitly gained U.S. dollars and make wire payments on behalf of foreign businesses while Turist-Câmbio collected local currency from the foreign businesses and used it to pay the criminals for the U.S. dollars deposited in the Venus Account. Through this system, Kesten and Turist-Câmbio were able to run a money laundering and exchange operation that saw billions of U.S. dollars move through Kesten's account.

5. This scheme came to an end in early 1999 when the U.S. Government seized the Venus Account due its ties to illegal funds. In conjunction with the seizure, the U.S. Government also brought criminal charges against Kesten's parent company, Turist-Câmbio for operating as an unlicensed money remitter and against Maria Carolina Nolasco, the banker who controlled the Venus account, for her assistance in the money laundering activities that occurred in the Venus Account. Nolasco was convicted of both money laundering and tax evasion in relation to her actions on behalf of Kesten and sentenced to 30 months in prison. In Brazil, the Brazilian authorities forced Turist Câmbio to cease business due to its illegal operations as a black-market money exchanger and brought criminal charges against its principals in Brazil.

6. TCB was a company incorporated in the Cayman Islands, in 1988, to provide off-shore banking services to the Velox Group. At all material times members of the Peirano family were directors and/or agents of TCB and, as such, owed fiduciary duties to TCB to act in its best interests at all times. The Velox Group was a collection of entities controlled by Jorge Peirano Facio and his sons Juan Peirano, Dante Peirano, Jose Peirano, and Jorge Peirano Basso (together, the "**Peiranos**"). Through the Velox Group, the Peiranos controlled over 40% of the banks in Uruguay. The Velox Group also included banks in Argentina and Paraguay and money exchange houses throughout South America

as well as various Cayman Islands and British Virgin Island based entities. In addition to the Velox Group, TCB's clients included individuals and companies from Argentina, Uruguay, Paraguay, Chile, and Brazil.

7.  TCB provided deposit accounts, payable-through accounts, custody accounts, Gold Visa products, term deposit accounts, loan accounts, fixed-term loans, investment banking, and exterior-commerce services. Its operations were run out of Montevideo, Uruguay, and movement of its funds was accomplished through correspondent bank accounts in New York, including accounts at Citibank and Swiss Bank. In 2002, it was discovered that the Peiranos had caused TCB to create two separate sets of accounts, one on-the-books and one off-the-books. The Peiranos used the on-the-books accounts to conceal the scheme from TCB's auditors and others. However, the off-the-books accounts revealed that the Peiranos looted over $800 million from TCB. After this scheme came to light, TCB was put into liquidation in the Cayman Islands.

8.  The Peiranos stole TCB's funds to finance their investments in the Velox Group and other entities as well as to support their lifestyle. To fund their scheme, the Peiranos solicited funds from TCB's customers who thought they were placing their funds in interest-bearing accounts, but instead the Peiranos were looting the funds for their personal use. The Peiranos also perpetrated a scheme in which their banks in Argentina, Uruguay, and Paraguay took deposits from their customers and loaned them to TCB in exchange for a note with a guaranteed rate of return. Thus, TCB held the money of its own customers along with the money of the other Velox Group banks' customers, with the Peiranos having access to all such funds. TCB deposited these funds into correspondent bank accounts, such as Citibank and Swiss Bank. The Peiranos then used the off-the-books accounts at TCB to launder money from these correspondent accounts through various third parties and Velox Group shell entities.

9.  The Peiranos' scheme depended on the customers of TCB and the other Velox Group banks leaving their deposits in the bank, because an attempt to withdraw the funds would expose the fact that the banks did not actually have the money available for withdrawal. The scheme unraveled in 2001, when the Argentine economy crashed. As Argentine

faith in the Argentine Peso fell, a run on the banks ensued. In response, the Argentine Government effectively closed the banks, limiting withdrawals to insubstantial amounts.

10. Argentines then went to neighboring Uruguay to withdraw their funds from Uruguayan banks, including those owned by the Peiranos. TCB and the Velox Group banks were unable to honor these withdrawal requests because the Peiranos had stolen their funds. The fraud was exposed and all of the Peiranos, except Juan Peirano Basso, were charged with various financial crimes by the Uruguayan authorities and were put in prison in Uruguay. Juan Peirano Basso escaped to the U.S., but in 2008, he was extradited and is now incarcerated in a Uruguayan prison as well pending trial.

11. All that was left behind by the Perianos were approximately US$800 million in obligations to TCB's former customers and Velox Group banks.

12. The Peiranos used a related entity, Tansy S.A ("**Tansy**"), and Kesten to launder TCB's funds. Kesten knowingly or recklessly assisted the Peiranos in this laundering by accepting TCB's stolen funds in the Venus Account, knowing there was no business purpose for the transaction.

13. Tansy was a Brazilian money remitter with operations in the Uruguayan free-trade zone and Montevideo, Uruguay. There was significant overlap and interaction between Tansy and TCB. The Peiranos partially owned and heavily influenced Tansy's operations, which, like TCB's, were located in Montevideo. Jorge Navarro, an officer at TCB, signatory on many of TCB's correspondent accounts, and close associate of Juan Peirano Basso, was associated with Tansy.

14. After the Peiranos' scheme was shut down, Navarro opened his own accounting firm and housed Tansy's operations inside its offices in Montevideo. Additionally, through its various accounts, Tansy participated in the laundering of hundreds of millions of U.S. dollars from TCB through third parties and shell entities. In excess of US$136 million was stolen from TCB from June 1998 to January 1999 and transferred to Tansy with no apparent business purpose or justification: TCB received nothing in exchange for those

transfers and these transfers were made by the Peiranos in breach of their fiduciary duties to act at all times in the best interest of TCB.

15. In addition to its involvement with TCB, Tansy had relationships with individuals and entities involved in black-market money-remitting. Tansy transferred at least US$500,000 to Maria Carolina Nolasco, the individual who was arrested in connection with the prosecution of Kesten's parent company, Turist-Câmbio for assisting in a black-market money exchange operation. She was paid for illegally transmitting money for currency-exchange houses and money-transmitting businesses in Brazil using dozens of bank accounts she controlled, including the Venus Account. The transfers from Tansy were made for her participation in the illegal money exchange operation.

16. As setout hereinbefore, Kesten's business was in illegal money exchange and laundering. For that business to work, Kesten needed access to U.S. dollars. TCB provided Kesten with that access. As with Tansy, there were connections between the Velox Group and Kesten. For example, Rosario Guadalupe Villarreal Pujado, a Uruguayan banker, managed one of the four Turist-Câmbio branches in Brazil. And, in 1994 Pujado purchased a 50% ownership interest in Turist-Câmbio, Kesten's parent company, which she later sold in 1998. Prior to her work for Turist-Câmbio, Pujado worked for Finambras, a member of the Velox Group that was 84% owned by Jorge Peirano. Additionally, when Kesten was in the process of opening the Venus Account at MTB Bank, the bank sought out references for Kesten's then principal, Antonio Pires de Almeida. Pires de Almeida previously held a bank account at MTB Bank, but moved his business to another bank when MTB Bank sought to put restrictions on his account. However, after he switched banks, the new bank was shut down. When Pires de Almeida sought to open an account for Kesten, he went back to MTB Bank. One of the references that MTB Bank cited as having vouched for Pires de Almeida and Kesten was the Velox Group.

17. Using their connections with Tansy and Kesten, the Peiranos laundered US$15.9 million through the Venus Account. It is evident from copies of the bank statements in respect of

and in relation to the Venus Account to which the Liqudators have access, that from in or around June 1998 to January 1999:

17.1. TCB transferred over US$136 million to Tansy (the "**Tansy Transfer**"); and

17.2. Following the receipt by Tansy of the Tansy Transfer, Tansy transferred US$15,936,369.56 million of that money to Kesten (the "**Kesten Transfer**").

18. The Kesten Transfer allowed the Peiranos to hide their misappropriation of TCB's funds by sending the funds to what appeared to be an unrelated entity. The Kesten Transfer was undertaken gratuitously with no business purpose or justification, and with no consideration given in return to TCB. The sole purpose of the Kesten Transfer was to obfuscate the theft of TCB's funds by the Peiranos.

19. Kesten knowingly received the funds constituting the Kesten Transfer and retained the funds for its own benefit. As a black-market money exchanger, Kesten was fully aware that the funds were the proceeds of the Peiranos' fraud on TCB. Further or in the alternative, even if Kesten was not actually aware of the nature of the funds, it was willfully blind to the obvious illicit nature of the funds and willfully or recklessly failed to make any inquiries as to the source of the funds. Kesten's actions in receiving the funds were dishonest, and aimed at making a profit with a conscious disregard for the harm done to TCB through the misappropriation of its assets.

20. In the premises, Kesten's knowing receipt and retention of the Transfers was and is unconscionable and the Claimant is therefore entitled to restitution of the Kesten Transfer in the sum of US$15,936,369.

AND THE CLAIMANT CLAIMS:

1. Restitution from the Defendant of the sum of US$15,936,369;

2. Costs.

Dated this   day of August 2010

**FORBES HARE**

**Legal Practitioners for the Claimant**

**STATEMENT OF TRUTH**

I certify that I believe that the facts stated in this Statement of Claim are true.

...........................

Richard Fogerty

**Joint Official Liquidator of Trade and Commerce Bank**