REID COLLINS & TSAI LLP

William T. Reid, IV,
Rachel S. Fleishman
30 Wall Street
New York, NY 10005
212.344.5200 (telephone)
212.344.5299 (facsimile)

*Attorneys for Richard Fogerty, Joint Official Liquidator of*
*Trade and Commerce Bank (In Liquidation)*

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>----------------------------------------------------------x<br>In re:<br><br>TRADE AND COMMERCE BANK (IN LIQUIDATION)<br><br>　　　　　　　　　　　　　　　Debtor,<br>----------------------------------------------------------x<br>RICHARD FOGERTY, as Joint Official<br>Liquidator of Trade and Commerce Bank<br><br>　　　　　　　　　　　　　　　Plaintiff,<br><br>　　　-against-<br><br>Kesten Development Corp.<br><br>　　　　　　　　　　　　　　　Defendant. | Chapter 15<br>Case No. 05-60279 (SMB)<br><br><br>Adv. Pro. No. 10-03611 (SMB) |

## APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMNARY INJUNCTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 1521 AND REQUEST FOR HEARING

Richard Fogerty ("**Fogerty**"), as the duly appointed Joint Official Liquidator of Trade and

Commerce Bank ("**TCB**"),[1] an entity organized under the laws of the Cayman Islands, by the

Grand Court of the Cayman Islands respectfully makes this application pursuant to 11 U.S.C. §§

---

[1] Declaration of William T. Reid IV, ("**Reid Decl.**") Exhibit A, Order Appointing Fogerty as Joint Official Liquidator.

1

105(a) and 1521, Federal Rule of Civil Procedure 65, and Bankruptcy Rule 7065 for entry of a temporary restraining order and preliminary injunction, substantially in the form attached hereto as Exhibit A, enjoining Kesten Development Corp. ("**Kesten**") from transferring, distributing, or otherwise moving any of its assets located in the United States, including the $6,871,042.36 seized by the United States Government ("**Government**") from the account named Venus, account number 030101107 at MTB Bank ("**Venus Account**") held in the name of and for the benefit of Kesten plus any interest earned until the completion of this adversary proceeding against Kesten and the execution of any judgment received in this proceeding.[2]

The funds Fogerty seeks to enjoin were stolen from TCB and deposited into the Venus Account, prior to the Government's seizure, as part of an international money laundering scheme. Antonio Pires De Almeida, Kesten's and its parent company Turist-Câmbio Viagens E Turismo Ltda.'s ("**Turist-Câmbio**") principal, is under indictment in Brazil and the United States for his criminal conduct in the Venus Account.[3] The banker that assisted De Almeida and Kesten to conduct their money laundering operation was convicted as a result of her actions.[4] And, the Government brought a civil suit related to this conduct against Kesten, Turist-Câmbio, De Almeida, and Roseli Ciolfi.[5]

After discovering Kesten's role in looting TCB, which occurred only recently, Fogerty brought an action in the British Virgin Islands against Kesten (a BVI Company) for its

---

[2] The funds seized from the Venus Account are Kesten's only known assets located in the United States.
[3] Reid Decl. Exhibit B, De Almeida Indictment.
[4] Reid Decl. Exhibit C, Nolasco Judgment.
[5] Reid Decl. Exhibit D, Kesten, Turist-Cambio, De Almeida, and Ciolfi Civil Complaint. Upon information and belief Roseli Ciolfi was inserted as principal of Kesten by De Almeida after his indictment in the U.S.

2

participation in the theft of TCB's funds ("**BVI Action**").[6] Kesten failed to appear and the court issued a default judgment in favor of TCB ("**BVI Judgment**").[7] Notice of the lawsuit and the judgment have been provided to Kesten's U.S. Counsel (Barry Fischer).[8] Fischer has stated that although Kesten is a BVI corporation, he does not believe BVI was the proper forum for TCB to bring claims against Kesten and he intends to continue to disregard the proceedings there.[9]

After receiving the judgment in the BVI, on September 16, 2010, Fogerty filed this adversary proceeding requesting this Court to recognize and enforce the BVI Judgment. If successful, Fogerty will distribute the net proceeds of any recovery to TCB's creditors, i.e., the victims of the fraud perpetrated on TCB.

The temporary restraining order and preliminary injunction are necessary because the past conduct of Kesten and its principals have evidenced their ability and inclination to transfer and move money is such a way as to hide its source and prevent those with an interest in the funds from asserting that interest. And, although Kesten's only known assets in the U.S. were seized from the Venus Account, after seizing those funds, the Government failed to forfeit them and was ordered by the United States District Court for the District of New Jersey ("**New Jersey District Court**") to return the funds to Kesten.[10] Before doing so, the Government obtained a restraining order from the United States District Court for the District of Columbia ("**D.C. District Court**"), enjoining the disbursement of the funds to Kesten pending criminal proceedings against the

---

[6] Reid Decl. Exhibit E, BVI Statement of Claim
[7] Reid Decl. Exhibit F, BVI Default Judgment
[8] Reid Decl. Exhitib G, C. Boneau email to B. Fischer and the Government dated September 17, 2010.
[9] Reid Decl. ¶ 3.
[10] Reid Decl. Exhibit H, New Jersey Court Order.

principals of Kesten in Brazil.[11] However, due to a recent District of Columbia District Court opinion, and upon the Government's motion, that Court vacated its restraining order on September 22, 2010.[12] Therefore, pursuant to the New Jersey District Court's order, the Government intends to distribute the funds to Kesten imminently. If Kesten is not enjoined from dissipating, transferring, or otherwise moving the funds, including out of the United States upon receipt, it will likely do so to prevent the Joint Official Liquidator from being able to recover on any judgment he receives against Kesten..

It is extremely urgent that a hearing on this Application be set as soon as possible as the Government plans to deliver the funds to Kesten *any day now* and Kesten's attorney, Barry Fischer, has formally demanded that the funds be transferred to Kesten. Once the funds are transferred TCB fears that Kesten will dissipate or move the funds outside of the country. As such, Fogerty further requests a hearing on this Application before September 28, 2010.

In support of this request, Fogerty would respectfully show as follows:

## I.   JURISDICTION AND VENUE

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§157 and 1334 and the Standing Order of Reference in this District dated July 10, 1984.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

Venue of this proceeding is proper in this district pursuant to 28 U.S.C. § 1410. The statutory predicates for the relief sought in this Application are Sections 105(a) and 1521 of the

---

[11] Reid Decl. Exhibit I, D.C. Court Restraining Order.
[12] Reid Decl. Exhibit J, D.C. Court Order to Vacate.

4

Bankruptcy Code and Rule 7065 of the Federal Rules of Bankruptcy Procedure and Federal Rule of Civil Procedure 65.

This Court granted TCB Recognition of Foreign Main Proceeding Pursuant to Sections 1515 and 1517 of the Bankruptcy Code on February 8, 2006.

## II. BACKGROUND

The debtor, TCB, was a Cayman Island entity, organized in 1988 and placed in liquidation in 2002.

Fogerty was appointed Joint Official Liquidator of TCB on March 18, 2004 by the Grand Court of the Cayman Islands.

### A. Peiranos' Scheme to Loot TCB of Over $800 Million

TCB was organized by Jorge Facio Peirano and his sons Juan Peirano, Dante Peirano, and Jose Peirano ("Peiranos") as a Cayman Island entity in 1988 to provide off-shore banking services to the Velox Group. The Velox Group was a collection of entities controlled by the Peiranos. Through the Velox Group, the Peiranos controlled over 40% of the banks in Uruguay. It also included banks in Argentina and Paraguay and money exchange houses throughout South America as well as various Cayman Island and British Virgin Island based entities. In addition to the Velox Group, TCB's clients included individuals and companies from Argentina, Uruguay, Paraguay, Chile, and Brazil.

TCB's banking operations were run out of Montevideo, Uruguay, and movement of its funds was accomplished through correspondent bank accounts in New York, including accounts at

Citibank and Swiss Bank.  In 2002, it was discovered that the Peiranos had caused TCB to create two separate sets of accounts, one on-the-books and one off-the-books.  The Peiranos used the on-the-books accounts to conceal the scheme from TCB's auditors and others.  However, the off-the-books accounts revealed that the Peiranos looted over $800 million from TCB.  After this scheme came to light, liquidation proceedings were initiated for TCB in the Cayman Islands.

      **1.**      **The Peiranos Looted TCB of Over $800 Million Through Fraud and Money Laundering**

The Peiranos stole TCB's funds to finance their investments in the Velox Group and other entities as well as to support their lifestyle.  To fund their scheme, the Peiranos used the off-the-books accounts at TCB to launder money from TCB's correspondent accounts, such as at Citibank and Swiss Bank, through various third parties and Velox Group shell entities.

      2.      **The Peiranos' Scheme Comes to an End**

The Peiranos' scheme depended on the customers of TCB and the other Velox Group banks leaving their deposits in the bank, because an attempt to withdraw the funds would expose the fact that the banks did not actually have the money available for withdrawal.  The scheme unraveled in 2001, when an economic crisis in South America caused a large number of TCB's customers to make simultaneous withdrawal requests from their accounts.  Of course, TCB and the Velox Group banks were unable to honor these withdrawal requests because the Peiranos had stolen their funds.  The fraud was exposed and all of the Peiranos, except Juan Peirano Basso, were put in prison in Uruguay.  Juan Peirano Basso escaped to the U.S., but in 2008, he was extradited and is now incarcerated in a Uruguayan prison as well.  All the Peiranos left behind was

approximately $800 million dollars in obligations to TCB's former customers and Velox Group banks.

C.   **Kesten's Used Its Black-Market Money Exchange Operation to Further the Peiranos' Scheme to Steal Millions of Dollars of TCB's Money**

The Peiranos used two third parties, Tansy, S.A. ("**Tansy**") and Kesten, to launder TCB's funds, concealing the outright theft of millions of dollars from TCB.  Kesten knowingly or recklessly assisted the Peiranos in this laundering by accepting TCB's stolen funds in the Venus Account, knowing there was no business purpose for the transactions.

   1.   **Tansy's Illicit Activities and Connection to TCB**

Tansy was a Brazilian money remitter with operations in the Uruguayan free-trade zone and Montevideo, Uruguay.  There was significant overlap and interaction between Tansy and TCB.  The Peiranos partially owned and heavily influenced Tansy's operations, which, like TCB's, were located in Montevideo.  Also, Jorge Navarro, an officer at TCB, signatory on many of TCB's correspondent accounts, and close associate of Juan Peirano Basso, was associated with Tansy.  In fact, after the Peiranos scheme was shut down, Navarro opened his own accounting firm and housed Tansy's operations inside its offices in Montevideo.  Additionally, through its various accounts, Tansy participated in the laundering of hundreds of millions dollars from TCB through third parties and shell entities.  In fact, in excess of $136 million was stolen from TCB from June 1998 to January 1999 and transferred to Tansy with no apparent business purpose or justification; TCB received nothing in exchange for those transfers.

In addition to its involvement with TCB, Tansy had relationships with individuals and entities involved in black-market money-laundering. For example, Tansy transferred at least $500,000 to Maria Carolina Nolasco, an individual who was arrested in connection with the prosecution of Kesten's parent company, Turist-Câmbio for assisting in a black-market money exchange operations in New York and New Jersey. She was paid for illegally transmitting money for currency-exchange houses and money-transmitting businesses in Brazil using dozens of bank accounts she controlled, including the Venus Account. Upon information and belief, the transfers from Tansy were made for her participation in the illegal money exchange operation.

2. **Kesten's Role in the Theft of $15.9 Million of TCB's Funds**

Kesten, along with its parent company Turist-Câmbio, a Brazilian money exchanger, conducted a black-market money laundering operation throughout South America and the United States from 1995 to 1999. The operation began shortly after Kesten was incorporated in the British Virgin Islands by the opening of the Venus Account, on or about July 12, 1995. Kesten used this account to accept illicitly obtained U.S. dollars from criminals, including TCB's looted funds, giving Kesten access to hundreds of millions of dollars to run its black-market money laundering operation.

As with Tansy, there were connections between the Velox Group and Kesten. For example, Rosario Guadalupe Villarreal Pujado, a Uruguayan banker, managed one of the four Turist-Câmbio branches in Brazil. And, in 1994 Pujado purchased a 50% ownership interest in Turist-Câmbio, Kesten's parent company, which she later sold in 1998. Prior to her work for Turist- Câmbio, Pujado worked for Finambras, a member of the Velox Group that was 84%

owned by Jorge Peirano. Additionally, when Kesten was in the process of opening the Venus Account at MTB Bank, the bank sought out references for Kesten's then principal, Antonio Pires de Almeida. One of the references that MTB Bank cited as having vouched for Pires de Almeida and Kesten was the Velox Group.

Using their connections with Tansy and Kesten, the Perianos laundered $15.9 million through the Venus Account. From June 1998 to January 1999, the same time frame TCB transferred over $130 million to Tansy, Tansy transferred $15.9 million of that money to Kesten. These transfers allowed the Peiranos to hide their looting of TCB's funds by sending the funds to a facially-unrelated entity. But, the transfers were done with no business purpose or justification, and with nothing given in return to TCB. The only purpose for the transfers was to obfuscate the theft of TCB's funds by the Peiranos.

### 3. Resulting Actions Against Kesten and its Principals

This scheme came to an end in early 1999 when the Government seized the Venus Account for its ties to illicit funds.[13] In conjunction with the seizure, the Government also brought criminal charges against Kesten's parent company, Turist-Câmbio, for operating as an unlicensed money remitter and against Maria Carolina Nolasco, the banker who controlled the Venus account, for her assistance in the money laundering activities that occurred in the Venus Account.[14] Nolasco was convicted of both money laundering and tax evasion in relation to her actions on behalf of Kesten and sentenced to 30 months in prison.[15] The Government also brought a civil

---

[13] Reid Decl. Exhibit K, Seizure Warrant.
[14] Reid Decl, Exhibit L, Dkt No. 1, Docket Report for *United States v. Nolasco et al*, Case No. 2:02-mj-03090-MF-1.
[15] Reid Decl. Exhibit C, Nolasco Judgment

9

action against Kesten, Turist-Câmbio, De Almeida, and Ciolfi for their money laundering activities.[16] In Brazil, the authorities forced Turist-Câmbio to cease doing business for its illegal operation as a black-market money exchanger and brought criminal charges against its principals.

After seizing the funds, the Government brought a forfeiture action against them.[17] The District Court in the District of New Jersey dismissed the action in 2004 because the Government was unable to trace the seized funds to the laundering of narcotics proceeds—the illegal activity giving rise to the forfeiture.[18] After multiple motions and appeals, in 2006 the United States dismissed its final appeal to the Third Circuit, and was never able to successfully forfeit the funds.[19] A few months before the dismissal and after the NJ District Court refused to order the forfeiture of the Venus Account Funds, on January 25, 2005, the Government, pursuant to the request of the Brazilian government under the Mutual Legal Assistance in Criminal Matters Treaty ("**MLAT**"), filed a Restraining Order Application in the District of Columbia District Court seeking to restrain the Venus Account pursuant to 28 U.S.C. § 2467(d)(3)(B)(i) and 18 U.S.C. § 983(j)(1)(a) (the "District of Columbia Action") while Brazil was seeking a final forfeiture order against Kesten's principal, De Almeida.[20] The Court granted the application and entered a restraining order pursuant to 18 U.S.C. § 983(j)(1)(A), under which the Court enjoined and restrained the Venus Account Funds.[21]

---

[16] Reid Decl. Exhibit D, Complaint, Kesten, Turist-Cambio, De Almeida, and Ciolfi Civil Complaint.
[17] Reid Decl. Exhibit M, Forfeiture Complaint.
[18] Reid Decl. Exhibit H, New Jersey Court Order.
[19] Reid Decl. Exhibit N, Third Circuit Order.
[20] *See* United States v. Pires et al., Case No. 1:05-mc-00040-RCL.
[21] *Id.*

However, in July 2010, District of Columbia Court of Appeals affirmed the holding of the United States District Court for the District of Columbia that funds in a U.S. bank account could not be restrained pursuant to an MLAT request unless there was a final foreign forfeiture order in the requesting country.[22] Because Brazil does not have a final forfeiture order, on September 23, 2010, the D.C. District Court vacated its restraining order prohibiting the distribution of the funds to Kesten.[23]

In a meeting with Fogerty and his counsel in early 2010, A.J. "Jack" de Kluiver ("**de Kluiver**"), Senior Trial Attorney for the United States Department of Justice, stated that when the current restraining order was dissolved, the Government will be forced to return the funds to Kesten pursuant to the Order by the United States District Court for the District of New Jersey.[24] The Government reiterated this position in its Motion to Vacate the Restraining Order in the D.C. District Court proceeding.[25] In fact, Kesten's attorney has already provided de Kluiver with the routing information of his attorney trust account for the distribution of the funds.[26]

On or about August 18, 2010, TCB brought suit against Kesten before the Eastern Caribbean Supreme Court High Court of Justice British Virgin Islands Commercial Division

---

[22] *See Any and All Funds or Other Assets in Brown Brothers Harriman & Co. Account No. 8870792 in the name of Tiger Eye Investments Ltd. ("Tiger Eye")*, No. 09-5065, 2010 WL 2794281 (D.C. Cir. July 16, 2010) ("**Tiger Eye**").
[23] Reid Decl. Exhibit J, Order to Vacate.
[24] Reid Decl. ¶ 2.
[25] Reid Decl. Exhibit O, Government's Motion to Vacate.
[26] Reid Decl. Exhibit P, B. Fischer Letter Dated September 14, 2010.

seeking restitution of the funds Kesten knowingly and unconscionably received from TCB through a third party.[27]

Kesten received notice of the action in the BVI, but failed to appear to defend the claim within the fourteen-day deadline for appearance and on September 15, 2010, the Eastern Caribbean Supreme Court High Court of Justice British Virgin Islands Commercial Division, issued a default judgment in favor of TCB and against Kesten in the amount of $15,936,369 plus costs.[28] The BVI Judgment was then served on Kesten.[29]

Fogerty then brought this adversary proceeding, requesting the Court to recognize and enforce the BVI Judgment on September 15, 2010.

### III.   RELIEF REQUESTED

By this Application, Fogerty seeks a temporary restraining order and preliminary injunction under 11 U.S.C. § 1521, FRCP 65, and Bankruptcy Rule 7065 enjoining Kesten from transferring, dissipating, distributing, or otherwise moving any assets located in the United States of America, including the $6,871,042.36 seized by the Government from the Venus Account plus any interest earned, until the completion of the litigation against Kesten and execution of any judgment received in that proceeding.

### IV.   AUTHORITY AND ARGUMENT

The relief sought by Fogerty is within the broad power of this Court as contemplated in 11 U.S.C. § 1521.

---

[27] Reid Exhibit E, BVI Statement of Claim.
[28] Reid Exhibit F, BVI Default Judgment..
[29] Reid Exhibit Q, Affidavit of Service.

12

### A. TCB Will Suffer Irreparable Harm if the Status Quo is not Maintained

If successful in its adversary proceeding to have the BVI Judgment recognized and enforced, Fogerty will execute the judgment on *Kesten's only known assets located in the United States, the funds seized from the Venus Account.* However, if Kesten is allowed to move those funds, they will likely be dissipated or leave the United States, and Fogerty will have no assets available to execute his judgment against. This would unjustly reward Kesten for illegal activity and allow it to evade its liability to TCB after assisting the Peiranos to fraudulently steal millions of dollars from TCB's coffers. Fogerty, on the other hand, would be deprived of the ability to recover TCB's assets and distribute them to its creditors, many of whom lost their life savings at the hands of the Peiranos and Kesten. Therefore, the injunctive relief requested is urgently needed to prevent TCB from suffering immediate and irreparable harm..

### B. Fogerty Meets the Applicable Standards to Receive a Temporary Restraining Order and Preliminary Injunction

Fogerty has provided actual notice of this Application to Kesten via hand delivery and Kesten's U.S. counsel via email and hand delivery.

Under FRCP 65, the Court may issue a temporary restraining order and preliminary injunction freezing the defendant's bank account to prevent a defendant from making itself judgment-proof.[30] Under Second Circuit law, "preliminary injunctions are proper to prevent a defendant from making a judgment uncollectible."[31] The standards applicable to an injunction under FRCP 65 are 1) irreparable harm and 2) either (a) the likelihood of success on the merits or

---

[30] *See Casio Computer Co., Ltd. v. Sayo*, No. 98 CIV 3772(WK), 1998 WL 352539, at *1 (S.D.N.Y. July 1, 1998).
[31] *Republic of Phillippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986) (granting a preliminary injunction intended to prevent any transfer or encumbrance of assets such that they would be out of the plaintiff's reach after receiving a judgment).

(b) the existence of sufficiently serious questions on the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in favor of the movant.[32]

A movant demonstrates irreparable harm when, without an injunction, a defendant will likely attempt to frustrate any judgment against it by making itself judgment proof.[33] The Court looks to the defendant's "past predilection for deceptive and fraudulent practices" to determine if those actions are likely to continue.[34]

### 1. **TCB will be Irreparably Harmed if a Temporary Restraining Order and Preliminary Injunction are not Issued**

Here, Kesten ran a black market money exchange business out of the Venus Account. As part of that business, it laundered illicitly gained funds in order to obscure the source of those funds. It did so fraudulently and deceptively. Specifically, Kesten received millions of TCB's stolen dollars, aiding the Peiranos in hiding the source of those funds from the victims of their fraud. If the Court does not enjoin Kesten, the funds will likely be dissipated or transferred out of the country and out of TCB's reach, preventing TCB from satisfying any judgment it receives against Kesten and irreparably harming TCB. And, yet again, Kesten will be able to prevent a victim of its wrongful activities from recovering its funds

---

[32] *Leibowitz v. Smith Barney, Inc.*, 863 F.Supp. 171, 173 (S.D.N.Y. 1994).
[33] *See Republic of Phillippines*, 806 F.2d at 356; *see also Gelfand v. Stone*, 727 F.Supp. 98, 101 (S.D.N.Y. 1989).
[34] *Id.*; *Motorola, Inc. v. Abeckaser*, 07-CV-3963( CPS)(SMG), 2009 WL 1362833, at *3 (E.D.N.Y. May 14, 2009) (holding irreparable harm was demonstrated when defendant had a history of transferring substantial assets and was likely to continue to do so such that any judgment would go unsatisfied absent an injunction);

### 2. **<u>Fogerty is Likely to be Successful on Merits in its Adversary Proceeding Against Kesten</u>**

Fogerty has demonstrated a likelihood of success on the merits by meeting the requirements to recognize and enforce a foreign judgment under New York Uniform Foreign Country Money-Judgments Recognition Act, New York C.P.L.R. §§ 5301 *et seq*. in its complaint in this adversary proceeding.

### 3. **<u>The Balance of Hardships Tips Overwhelmingly in Favor of Fogerty and TCB</u>**

Enjoining the movement of Kesten's assets will maintain the status quo as it has been for over ten years. Any additional hardship caused to Kesten -- which has never appeared to challenge the District of Columbia restraining order or appeared in the BVI Action--by enjoining the movement of its assets for a short time longer will be minimal. However, without the injunction, the hardship to TCB and its creditors will be substantial – indeed irreparable -- because TCB will be unable to execute on its judgment, and in turn, its creditors will receive none of the funds owed to the estate. Therefore, the balance of the hardships favors granting the preliminary injunction enjoining the disbursement of the funds.

### **CONCLUSION**

Kesten's past predilection for illegally moving funds to obscure their source leads to only one conclusion, if they are allowed to, they will likely do so with any assets they receive from the Government to avoid any liability it may have to TCB as a result of this proceeding. Therefore, without a temporary restraining order and preliminary injunction TCB will be unable to satisfy any judgment it receives against Kesten, frustrating Fogerty's efforts to recover the assets of the

Chapter 15 debtor. Fogerty has established the necessary requirements for the Court to enjoin Kesten from moving or transferring their assets located in the United States, including those seized from the Venus Account, until the conclusion of the litigation against Kesten.

WHEREFORE, Fogerty respectfully requests that the Court grant this Application for a Temporary Restraining Order and Preliminary Injunction Pursuant to 11 U.S.C. §§ 105(a) and 1521 and Request for Hearing, set a hearing on or before September 28, 2010, and enter, substantially in the formed annexed hereto, the preliminary injunction enjoining Kesten from transferring, distributing, dissipating, or otherwise moving any of its assets located in the United States, including the $6,871,042.36 seized by the Government from the account named Venus, account number 030101107 at MTB Bank held in the name of for the benefit of Kesten plus any interest earned, until the completion of the litigation against Kesten and execution of any judgment received in that proceeding

Dated: New York, New York
September 24, 2010

Respectfully submitted,
REID COLLINS & TSAI LLP

*/s/ William T. Reid IV*
William T. Reid IV
Rachel S. Fleishman
30 Wall Street
New York, New York 10005
Tel.:     (212) 344-5200
Fax:     (212) 344-5299
wreid@rctlegal.com
rfleishman@rctlegal.com

*Attorneys for Richard Fogerty, Joint Official Liquidator of Trade and Commerce Bank (in Liquidation)*

TO:   Sucre & Sucre Trust Ltd.
      Chera Chambers
      Main Street
      P.O. Box 3163
      Road Town
      Tortola
      British Virgin Islands

      Barry Fischer
      550 Fifth Ave
      6th Floor
      New York, NY 10036-5007
      Telephone: (212) 840-9300
      Fax: (212) 840-9323

# CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of September 2010, I served a true and correct copy of the foregoing **APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO 11 U.S.C. §§ 105(a) AND 1521 AND REQUEST FOR HEARING** by hand delivery to the following registered agent and by regular mail to counsel for Defendant Kesten Development Corp. (counsel also served by email) and by email to and the United States Department of Justice:

Sucre & Sucre Trust Ltd.
Chera Chambers
Main Street
P.O. Box 3163
Road Town
Tortola
British Virgin Islands

Barry Fischer
550 Fifth Ave, 6th Floor
New York, NY 10036-5007
Telephone: (212) 840-9300
Fax: (212) 840-9323

*/s/ William T. Reid IV*
William T. Reid IV