IN THE GRAND COURT OF THE CAYMAN ISLANDS            CAUSE NO 496 OF 2002

Mr. Justice Sanderson in Chambers

In the matter of the Companies Law (2003 Revision)
And in the matter of Trade and Commerce Bank (the "Company")

I, Linda R. Barlow, certify this
to be a true copy of the original.

*Linda Barlow*

Date: 10. 11. 05
NOTARY PUBLIC
FOR THE CAYMAN ISLANDS
My commission expires January 31st 2006

**ORDER**

UPON HEARING Counsel for the Applicants

AND UPON READING the affidavit of Don W Ebanks sworn herein

IT IS HEREBY ORDERED THAT:

1.  paragraph 7 of the Winding Up Order dated 29th August 2002 be varied by amending it to read as
    follows: "The Official Liquidators shall be entitled to receive remuneration for their services by
    reference to the time properly given by them and their staff in attending to matters arising in the
    winding-up and the hourly rates and the amount of remuneration shall be determined in accordance
    with Rules 4.127 – 131";

2.  paragraph 20 of the Winding Up Order dated 29th August 2002 be varied by amending it to read as
    follows: "The Third Official Liquidator shall be entitled to receive remuneration for his services by
    reference to the time properly given by him and his staff in attending to matters arising in the
    winding-up and the hourly rates and the amount of remuneration shall be determined in accordance
    with Rules 4.127 – 131"

3.  this Order shall not prevent a Liquidation Committee or the creditors from agreeing that the official
    liquidators' remuneration be fixed as a percentage of the value of the assets which are realised or
    distributed";



**EXHIBIT A**

a formal committee of creditors be formed within 50 days;

5. a copy of Grand Court Practice Direction No. 2/2003 and a copy of the documents entitled "A Creditors' Guide to Liquidators' Fees Cayman Islands" dated 30th June 2003 be delivered to all creditors;

6. Don W Ebanks of Ernst & Young Ltd., of 4th Floor, Bermuda House, British American Centre, Dr Roy's Drive, George Town, Grand Cayman be discharged as one of the Joint Official Liquidators of the Company;

7. Richard Fogerty of Ernst & Young Ltd. of 4th Floor, Bermuda House, British American Centre, Dr Roy's Drive, George Town, Grand Cayman be appointed a Joint Official Liquidator of the Company; and,

5. that the costs of this application be paid from the assets of the Group Companies as defined in the Pooling Order dated 6th June 2003.

_____
Honourable Mr Justice Sanderson

Dated this 18th day of March, 2004
Filed this 24 day of March 2004

This Order is filed by Messrs. Campbells, attorneys-at-law for the Applicants, whose address for service is 4th Floor, Scotiabank Building, George Town, Grand Cayman (Ref AJW)

FILED

MAR 8 2001

AT 8:30 _____
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 01-161 (NHP) |
| | : | |
| v. | : | 18 U.S.C. §§ 1956(h) |
| | : | and 982(a) |
| ANTONIO PIRES De ALMEIDA, | : | |
| RAOUL SROUR, and | : | |
| FLAVIO SUAREZ, | : | I N D I C T M E N T |
| a/k/a "Marcos Suarez," | | |
| a/k/a "Marcos" | | |

The Grand Jury in and for the District of New Jersey,

sitting at Newark, charges:

## COUNT ONE

From in or about February, 1998 to on or about April 2, 1998,

in Monmouth County, in the District of New Jersey, and elsewhere,

the defendants

ANTONIO PIRES De ALMEIDA,
RAOUL SROUR, and
FLAVIO SUAREZ,
a/k/a "Marcos Suarez,"
a/k/a "Marcos"

did knowingly and wilfully conspire and agree with one another

and with others to conduct financial transactions affecting

interstate and foreign commerce, which involved the proceeds of

specified unlawful activity, that is, drug trafficking, knowing

that the transactions were designed in whole and in part to

conceal and disguise the nature, the location, the source, the

ownership and the control of the proceeds of specified unlawful

EXHIBIT B

activity, and while conducting these financial transactions, knowing that the property involved represented the proceeds of some form of unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(1)(B)(i).

In violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATION

1.    The Grand Jury realleges and incorporates by reference the allegations contained in Count One of this Indictment.

2.    Pursuant to Title 18, United States Code, Section 982(a)(1), each defendant who is convicted of the offense set forth in Count One shall forfeit to the United States the following property:

a.    All right, title, and interest in any and all property, real and personal, involved in the offense set forth in Count One and all property traceable to such property, including the following: i) all money and other property that was the subject of the violation of Title 18, United States Code, Section 1956; ii) all commissions, fees and other property constituting proceeds obtained as a result of that violation; and iii) all property used in any manner and part to commit and to facilitate the commission of the violation.

b.    A sum of money equal to the total amount of money involved in the offense. If more than one defendant is convicted of the offense, the defendants so convicted are jointly and severally liable for the amount involved in such offense.

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), each defendant shall forfeit substitute property, up to the value of the amount described in paragraph 2, if, by any act

or omission of any defendant, the property described in paragraph 2, or any portion thereof, - -

a. cannot be located upon the exercise of due diligence,

b. has been transferred or sold to, or deposited with, a third party,

c. has been placed beyond the jurisdiction of the Court,

d. has been substantially diminished in value, or

e. has been commingled with other property which cannot be subdivided without difficulty.

All in accordance with Title 18, United States Code, Section 982(a)(1).

A TRUE BILL

FOREPERSON

ROBERT J. CLEARY
United States Attorney

Certified as a true copy on
This Date 3-12-01
By _____
Clerk

AO 245B (Mod. D/NJ 12/06) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## District of New Jersey

UNITED STATES OF AMERICA

v.                                                Case Number   Cr. 04-617-01

MARIA CAROLINA NOLASCO

    Defendant.

## AMENDED JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

    The defendant, MARIA NOLASCO, was represented by Cathy Waldor.

    On motion of the United States the court has dismissed count(s) 6,7 & 8.

    The defendant pled guilty to count(s) 1,2,3,4 & 5 of the INDICTMENT on 10/4/04. Accordingly, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date of Offense | Count Number(s) |
|---|---|---|---|
| 18:1960 & 2 | Operating a money transmitting business without a licence | 10/26/01 through 6/27/02 | 1 |
| 26:7201 | Income Tax Evasion | 4/15/99 through 4/15/02 | 2,3,4 & 5 |

    As pronounced on 1/28/09, the defendant is sentenced as provided in pages 2 through 4 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

    It is ordered that the defendant shall pay to the United States a special assessment of $500.00, for count(s) 1,2,3,4 & 5, which shall be due immediately. Said special assessment shall be made payable to the Clerk, U.S. District Court.

    It is further ordered that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

    Signed this the 27th day of April, 2009.

JOSEPH A. GREENAWAY, JR.
United States District Judge

07307

EXHIBIT C

AO 245B (Mod. D/NJ 12/06) Sheet 2 - Imprisonment

Judgment – Page 2 of 4

Defendant:   MARIA CAROLINA NOLASCO
Case Number:   Cr. 04-617-01

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 30 Months on each of counts 1,2,3,4 & 5 to run concurrently.

The Court makes the following recommendations to the Bureau of Prisons: Fort Dix, New Jersey.

The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons at 9:00 a.m. on April 17, 2009.

## RETURN

I have executed this Judgment as follows:

_____

_____

_____

Defendant delivered on _____ To _____ , with a certified copy of this Judgment.

At _____

_____
United States Marshal

By _____
Deputy Marshal

AO 245B (Mod. D/NJ 12/06) Sheet 3 - Supervised Release

Defendant:   MARIA CAROLINA NOLASCO
Case Number:   Cr. 04-617-01

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of 2 years on each of counts 1,2,3,4 & 5 to run concurrently.

Within 72 hours of release from custody of the Bureau of Prisons, the defendant shall report in person to the Probation Office in the district to which the defendant is released.

While on supervised release, the defendant shall comply with the standard conditions that have been adopted by this court (on the next page).

Based on information presented, the defendant is excused from the mandatory drug testing provision, however, may be requested to submit to drug testing during the period of supervision if the probation officer determines a risk of substance abuse.

If this judgment imposes a fine, special assessment, costs, or restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine, assessments, costs, and restitution that remains unpaid at the commencement of the term of supervised release and shall comply with the following special conditions:

The defendant shall provide the U.S. Probation Office with full disclosure of her financial records to include yearly income tax returns upon the request of the U.S. Probation Office. The defendant shall cooperate with the probation officer in the investigation of her financial dealings and shall provide truthful monthly statements of her income.

The defendant is to fully cooperate with the Internal Revenue Service by filing all delinquent or amended returns within six months of the sentence date and to timely file all future returns that come due during the period of supervision. The defendant is to properly report all correct taxable income and claim only allowable expenses on those returns. The defendant is to provide all appropriate documentation in support of said returns. Upon request, the defendant is to furnish the Internal Revenue Service with information pertaining to all assets and liabilities, and the defendant is to fully cooperate by paying all taxes, interest and penalties due, and otherwise comply with the tax laws of the United States.

As a further special condition of supervision, the defendant is to refrain from obtaining employment in the field of banking for the period of supervised release.

The defendant shall cooperate in the collection of DNA as directed by the probation officer.

Judgment – Page 4 of 4

Defendant:   MARIA CAROLINA NOLASCO
Case Number:   Cr. 04-617-01

## STANDARD CONDITIONS OF SUPERVISED RELEASE

While the defendant is on supervised release pursuant to this Judgment:

1)   The defendant shall not commit another federal, state, or local crime during the term of supervision.

2)   The defendant shall not illegally possess a controlled substance.

3)   If convicted of a felony offense, the defendant shall not possess a firearm or destructive device.

4)   The defendant shall not leave the judicial district without the permission of the court or probation officer.

5)   The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month.

6)   The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.

7)   The defendant shall support his or her dependents and meet other family responsibilities.

8)   The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.

9)   The defendant shall notify the probation officer within seventy-two hours of any change in residence or employment.

10)   The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute or administer any narcotic or other controlled substance, or any paraphernalia related to such substances.

11)   The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.

12)   The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.

13)   The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.

14)   The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.

15)   The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court.

16)   As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

*For Official Use Only - - - U.S. Probation Office*

Upon a finding of a violation of probation or supervised release, I understand that the Court may (1) revoke supervision or (2) extend the term of supervision and/or modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions, and have been provided a copy of them.

You shall carry out all rules, in addition to the above, as prescribed by the Chief U.S. Probation Officer, or any of his associate Probation Officers.

(Signed) _____
                        Defendant                                           Date

_____
U.S. Probation Officer/Designated Witness                Date

CHRISTOPHER J. CHRISTIE
United States Attorneys Office
PETER W. GAETA
Assistant United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2927
PWG - 4990

RECEIVED-CLERK
U.S. DISTRICT COURT
2004 JAN 12 P 3: 21

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : HON. |
| -v- | : Civil Action No. 04-115 (JWB) |
| | : |
| ANTONIO PIRES DE ALMEIDA; | : |
| TURIST-CAMBIO VIAGENS E TURISMO LTDA; | : |
| KESTEN DEVELOPMENT CORP.; and | : |
| ROSELI CIOLFI, | : |
| Defendants. | : |

The United States of America, acting by and through its attorney Christopher J. Christie,

United States Attorney for the District of New Jersey (Peter W. Gaeta, Assistant United States

Attorney, and Stefan D. Cassella, Deputy Chief, Asset Forfeiture Money Laundering Section,

United States Department of Justice, appearing), files this complaint for a civil penalty pursuant

to Title 18, United States Code, Section1956(b), and states as follows:



EXHIBIT D

## I. JURISDICTION AND VENUE

1.    This Court has jurisdiction of this case pursuant to Title 18, United States Code, Section, 1956(b) and under the provisions of Title 28, United States Code, Sections 1331 and 1345.

2.    Venue lies in the United States District Court for the District of New Jersey under the provisions of Title 28, United States Code, Section 1391.

## II. PARTIES

3.    Antonio Pires de Almeida ("Pires") is a foreign national residing in Brazil. At least since the 1990's, Pires has been involved in money laundering activities in the United States through the use of various corporate entities including Turist-Cambio Viagens e Turismo Ltda. ("Turist-Cambio"), Kesten Development Corp. and others. Pires is currently under indictment in the United States District Court for the District of New Jersey for alleged violations of Title 18, United States Code, Section 1956. See United States v. de Almeida, et al., Docket No. 2:01-cr-00161 (JWB).

4.    Roseli Ciolfi is an unindicted co-conspirator in the criminal case who facilitates the money laundering activities of Pires at his direction through Turist-Cambio, Kesten Development Corporation and other shell corporations. Both Pires and Ciolfi have been absent from the United States for at least several years.

5.    Turist-Cambio is a foreign corporation, incorporated under the laws of the Federative Republic of Brazil. Kesten Development Corp. is a foreign corporation, incorporated under the laws of the British Virgin Islands. Pires is a duly appointed representative of Turist-

2

Cambio who exercises dominion and control over all accounts used and maintained by Turist-Cambio, Kesten and other entities involved with his illegal activities.

### III. BACKGROUND ON MONEY LAUNDERING AND THE BLACK MARKET

6.     Money laundering is the process of converting the proceeds of an unlawful act into another form so that the money can be used to continue the unlawful activity, or so that it can be concealed from law enforcement authorities. Drug traffickers need to launder their money because their activities generate large sums of currency that must be converted into a more useable form, because they need to exchange the currency for local currency to finance their operations abroad, and because they want to conceal their assets from law enforcement.

7.     To launder their money, drug traffickers typically engage the services of professional currency exchange brokers ("money exchangers") who accept delivery of the drug proceeds from the drug trafficker, pay the drug trafficker in local currency in his home country, and then sell the drug money on the "Black Market" to customers who need or desire to acquire U.S. dollars. Money exchangers who participate in this process are fully aware that they are buying and selling drug proceeds and that their services serve to facilitate the drug trafficking operation. The money exchangers, however, are generally independent of the drug trafficking operation and are engaged in the business of buying and selling currency for profit.

8.     The "Black Market" is a community of money exchangers operating outside of the official banking system in Central and South American countries. These money exchangers acquire drug proceeds from drug traffickers, smuggle the money out of the United States, and

3

then sell it to their customers. In doing so, the money exchangers typically use legitimate money exchange businesses as a cover for their money laundering activity.

9.      In a typical money laundering scheme, a person in the drug trafficker's organization responsible for money management will deliver a quantity of U.S. currency to the U.S. based agent of a foreign money exchanger. This is arranged via a system of using pagers, pay telephones, and cellular telephones, frequently using coded communication. Once the money is delivered, it is responsibility of the money exchanger to pay the drug trafficker in local currency in the foreign country, to smuggle or otherwise transport the U.S. currency out of the United States, and to convert the U.S. currency into a form – such as checks or bank deposits in the United States – that can be sold to the money exchanger's customers on the Black Market.

10.     Money exchangers use many different means to transport currency out of the United States, and many different means of selling the currency to Black Market customers. Among other things, they may convert the currency to cashiers checks, money orders, travelers checks or other monetary instruments that are then sold directly to customers in the foreign country or are repatriated to the United States and deposited into a U.S. bank account and distributed from their by means of wire transfers to Black Market customers. As part of this process, money exchangers frequently exchange dollars with other foreign money exchangers.

## IV. FACTS OF THE CASE

11.     Pires is a money exchanger with a large money exchange business based in Brazil. Throughout the latter part of the 1990's, he used various bank accounts in the United States to launder millions of dollars in narcotics proceeds that he acquired directly and indirectly from drug trafficking organizations and to sell those proceeds to customers on the Black Market. Such

4

money laundering activity is in violation of Title 18, United States Code, Sections 1956(a)(1),
1956(a)(2) and 1957.

12.     Evidence establishing Pires and Ciolfi's money laundering activities through
Turist-Cambio and other entities maybe may be summarized as follows:

### A. The Glikas Organization

13.     In the course of numerous investigations in the New York City/New Jersey
metropolitan area, the Drug Enforcement Administration (DEA) has determined that one Ernesto
Ceballos (hereinafter "Ceballos") is the leader of a major drug organization responsible for
distributing thousands of kilograms of cocaine into the United States from South America.
Ceballos operates his sophisticated drug operation from South America and employed workers in
the New York metropolitan area who were responsible for receiving narcotics from Ceballos and
arranging for the transportation of narcotics proceeds out of the United States back to South
America.

14.     Ceballos was indicted for drug trafficking offenses in 1992 in the People v. Luis
Barrera, CT92-0102 (N.Y. Sup. Ct., 1992), for his distribution of multi-kilogram amounts of
cocaine. He remains a fugitive on this indictment and continues to run his drug operation from
Colombia. He is responsible for the importation of more than 15,000 kilograms of cocaine per
year.

15.     The DEA investigations also determined that one Marcos Glikas (hereinafter
"Glikas"), a money exchanger in Sao Paulo, Brazil, was laundering money for the Ceballos
organization and other drug traffickers through the Black Market Exchange. Glikas operated a
business known as Miratur which employed, among others, the following individuals: Tania

Schahanof, a/k/a "Ana" (hereinafter "Schahanof"), Alberto Kern, (hereinafter "Kern") and Ricardo Amaral a/k/a "Magro" (hereinafter "Amaral"). The investigation showed that these individuals were responsible for picking up the drug proceeds from stash houses in New York and New Jersey, arranging for the transportation of the money via couriers, smuggling the money out of the United States, and, ultimately, repatriating the money in other forms such as bundles of personal checks into the bank accounts maintained by Pires, Raoul Srour, Antonio Claramunt[1] and other money exchangers in the United States in furtherance of their money laundering activity.

16.     The money laundering operation operated on an enormous scale. Schahanof's function was to come to the United States to manage and receive narcotics proceeds from various individuals. Upon receiving the funds, Schahanof would verify the amount and contact Glikas who would then have couriers travel from Brazil to the United States to meet with Schahanof, who in turn was instructed to turn over the proceeds to the couriers for delivery back to Brazil. Schahanof was in effect the "stash manager" for the money laundering organization. Investigation by the DEA revealed that on average Schahanof would receive two deliveries per day from various drug organizations totaling approximately $600,000.00 per day during her many stays in the United States.

17.     Amaral functioned as a courier. He smuggled some of the currency collected by Schahanof out of the United States, and was responsible for physically transporting huge quantities of third-party checks back into the United States after the smuggled currency had been

---

[1] Antonio Claramunt is currently a fugitive from Brazilian authorities for crimes against their financial system and money laundering.

converted into that form by Pires, Srour and others. He then deposited the funds into bank accounts designated by Glikas.

18.     U.S. Customs documents indicate that Amaral transported approximately $824,000.00 in cash during nine trips from the United States to Brazil over a 12 month period from January 1997 through December 1997. Also, during the period from January 1996 though April of 1998, Amaral entered the United States 76 times and declared approximately $90,970,194.00 in third party checks which he listed as belonging to Glikas and/or Glikas' company, Miratur. In particular, between January 6, 1998 through April 24, 1998, Amaral made 13 trips to the United States and declared $22,214,041.00 dollars in the form of personal checks, cashier checks, money orders and traveler checks.

19.     Schahanof and Amaral also coordinated their activities with each other. Typically, at the same time that Amaral was entering the United States with third party checks, Schahanof was managing the transportation of drug proceeds out of the country. For example, on February 4, 1998, Schahanof was exiting the country while Amaral was entering with $1,884,061.00 in checks. On February 19, 1998 Schahanof was exiting the country while Amaral was entering with $2,283,684.00 in checks. Schahanof was briefly detained on March 3, 1998, and $757,410.00 in cash was seized from her at the Doral Inn. However, telephone intercepts reveal that she was to stay at the Doral until March 5th. On March 4, 1999, Amaral entered the United States with $2,072,198.00 in checks. On April 14, 1998, Schahanof entered the United States and on April 15, 1998 she exited. On April 15, 1998, Amaral entered the United States with $2,044,393.00 in checks.

7

20.     This coordinated activity provided control over the drug proceeds.  By staggering their entries and exits, members of the Glikas organization minimized the potential for detection, maintained the needed revenue flow, and avoided having to have different couriers traveling together at the same moment.

21.     Glikas personally delivered large sums of narcotics proceeds to Pires, as well as Raoul Srour and Antonio Claramunt.

22.     Glikas and Kern were convicted of money laundering on March 19, 1999.  United States v. Marcos Glikas, et al., Criminal number: 98-265.  Amaral was indicted on money laundering charges and pled guilty to a violation of Title 18, United States Code, Section 4. Schahanof was indicted on money laundering charges but remains a fugitive.

23.     Glikas, as a cooperating individual, stated that Pires, along with Srour and Claramunt knowingly accepted drug proceeds for use in their illegal money laundering and exchange operations.

### B. Speedo Joyeros Organization

24.     Speedo Joyeros was a wholesale gold exchange company where hundreds of millions of dollars in jewelry was sold to a host of customers throughout South America.  The client base used drug proceeds, sold through cambios, to purchase gold from Speedo and smuggle the jewelry into their county.  Speedos willingness to accept these drug proceed enabled clients and money exchange houses to expand their businesses.  One of the exchange houses that sent money to Speedo was "Venus," controlled by Pires and his associate Roseli Ciolfi.  Raoul Srour, through the Jazz account and Antonio Claramunt, through the Beacon Hill/Lisco account also sent drug proceeds to Speedo.

8

Moshe and Yardena Hebroni were the owners and operators of Speedo Joyeros which was located in Colon, Panama. Moshe Hebroni died in Panama under suspicious circumstances in or around December 1997. His wife, Yardena was arrested by the DEA on September 17, 2000, and pled guilty to narcotics money laundering in March, 2002 following a long term investigation into their activities.

25.     On numerous occasions during 1997-98, Moshe Hebroni instructed Marcos Glikas that there was drug money in New York that needed to be picked up and laundered. Glikas would arrange for the money to be picked up in the United States and smuggled out of the United States in suitcases to Brazil. From there Glikas would distribute these monies to various exchange houses in Brazil for use in their Black Market money laundering business. These exchange houses included Turist-Cambio, owned and operated by Antonio Pires de Almeida and Roseli Ciolfi; and an exchange house owned and operated by Srour and Antonio Claramunt. The exchange houses receiving these drug proceeds would use the money to cash out dollar denominated checks and those checks were returned to Glikas who would, as previously described, use his organization to bring them back into the United States and deposit them into the subject accounts controlled by Antonio Pires de Almeida and Turist-Cambio Viagens e Turismo Ltda. and Kesten Development Corp.

These narcotics proceeds were available for sale to other persons or businesses who buy these monies by paying for them in different currencies or locations and subsequently having the funds wired to wherever or whomever desired. Speedo Joyeros was the recipient of approximately 2.2 million dollars between 1997 - 1999 from the "Venus" account controlled by Pires, the Beacon Hill/Lisco controlled by Claramunt and Jazz account controlled by Srour.

9

Speedo's clients who needed dollars to pay for jewelry in Speedo's Panama store, would purchase black market narcotics proceeds from the subject accounts and have those funds delivered by wire transfer to Speedo. Once in the possession of Speedo, their clients would have the jewelry smuggled into home countries and sold on the black market to avoid customs duties on jewelry. Proceeds from those sales would ultimately then be used to purchase more black market dollars and continue the money laundering cycle.

26.    Pires and Roseli Ciolfi operated Turist Cambio and Kesten Development in violation of Brazilian money laundering laws by maintaining and operating accounts in the United States including but not limited to the "Venus" account. Their activities are currently under investigation by the Brazilian Federal Prosecutors Office.

27.    Srour and Claramunt maintained and operated the Jazz and Lisco accounts in the United States in violation of Brazilian money laundering laws.

28.    Pires and Roseli Ciolfi through Turist Cambio and Kesten and Srour through the Jazz account and Claramunt through the Lisco account all profited from their narcotics money laundering activities with Speedo.

### C. Raoul Srour and the "JAZZ" account

29.    Raoul Srour is the owner of a money exchange house in Brazil engaged in illegal Black Market transactions. Srour, a business associate of Pires, would also use his money laundering exchange business to transport illegal proceeds. Srour's business in Brazil would receive drug proceeds picked up by Glikas and his accomplices in the United States as described above. Srour used the drug proceeds in furtherance of his check cashing and money exchange

business. These activities generated millions of dollars of checks which the Glikas organization delivered back into the United States and into accounts controlled by Pires and Srour.

30. As part of his money laundering operation, Srour maintained a bank account at MTB bank called "Jazz." This account has been used for the receipt of millions of dollars and subsequent payments consistent with money laundering activity.

31. An analysis of the incoming credits to the Jazz account demonstrated that the account had received over $7.6 million dollars from an account maintained by Beacon Hill Service Corp. named "Lisco." Lisco is owned and operated by Antonio Claramunt, a/k/a "Tonio," another person engaged in illegal Black Market exchanges. These monies came in over the course of 61 wire transfers. The wires originated from drug dollars delivered to Srour and Claramunt by Glikas and ultimately converted into millions of dollars in checks. The checks, as described above, were brought to the United States by Glikas and deposited to the Lisco account. Monies delivered to the Beacon Hill Lisco account were then wire transferred and internally book transferred to Venus from the Jazz account at MTB bank  A review of these transactions was conducted for the time period of January 1, 1997 to January 1999 showing a total transfer into Jazz of $7,636.206.79.

32. An analysis of the outgoing transfers from the Jazz account showed that from January - December 1998 shows that in addition to the $7.6 million dollars referenced above an additional 14 million dollars was sent from the Jazz account to the Venus account. These monies were sent over a series of 145 "book transfers" from Jazz to Venus. Book Transfers are transfers of monies sent from one account to another at the same bank. These transfers do not leave the bank and are not included in transfers involving the Federal Reserve system or other commercial

11

systems. A money launderer uses the "book transfer" process to help shield the illegal transactions by allowing him to split up large amounts of money into smaller wires utilizing several accounts and then to consolidate them back into a main account through internal transfers. The appearance of numerous wire transfers to numerous accounts makes this part of the money laundering cycle appear normal.

33.     Finally, this analysis demonstrates that the Venus account never sent money back to Jazz during the time period. Jazz acted as a "cut-out" attempting to help insulate Venus from detection of their money laundering activities.  Unlike other accounts involved in legitimate money transfer business where monies are sent back and forth between the accounts, at no time did the analysis show a two way system of transfers.

### 4. Beacon Hill Service Corporation a.k.a. BHSC

34,     Beacon Hill Service Corporation's (BHSC) accounts were shut down on February 4, 2003 following the execution of a search warrant on the company's location at 226 E 54th St. in Manhattan. The company's operations were closed by the Manhattan District Attorneys Office for running an illegal money remitting operation.  The company was remitting billions of dollars of funds worldwide without a state mandated license in violation of Article 13B - Transmitters of Money under violations and penalties of Section 650 2b1 of the New York State Banking Laws. More than $13 million dollars has been restrained as part of the state forfeiture action which is expected to go to trial sometime in the near future.

### 5. Carolina Nolasco Investigation

35.     On June 27, 2002, the United States Custom's Service seized the contents of 39 bank accounts located at Merchants Bank of New York totaling approximately 21 million

12

dollars. These accounts were identified and seized after tracing narcotics proceeds into a related account. Transactions in the accounts were controlled by a Merchant's Bank employee by the name of Carolina Nolasco. Nolasco was a private banker who serviced Brazilian Black Market exchange houses from her New York/New Jersey location.

36.    The accounts have become the subject of a large international investigation involving the use of United States bank accounts for the purpose of unlicensed money remittance in violation of Title 18, United States Code Section 1960 and money laundering in violation of Title 18, United States Code Section 1956. To date, over $21 million dollars has been seized. Several of these accounts belong to Pires and were named "Gatex" "Harber" and "Sorabe."

37.    Pires opened the Gatex, Harber and Sorabe accounts as a result of the DEA investigation into the operation of his Venus account at MTB Bank. Pires was alerted to the DEA investigation and was concerned that his money laundering operation was in jeopardy. On January 10, 1999, just three days before the Venus account was seized, he traveled to the United States and signed documents in order to open these new money laundering accounts at Merchants Bank with the assistance of Carolina Nolasco. From January 13, 1999 through December 3, 1999 approximately $8.2 million was seized from the Venus and Tadeland accounts representing proceeds involved in or traceable to narcotics money laundering (these funds are subject to forfeiture in United States v. $8,221,877.16, Docket No. 00-CV-2667 (JWB)). Pires exercised dominion and control over all of the accounts at both banks and was aided by Roseli Ciolfi in their operation.

38.    The Sorabe, S.A. account was opened at Merchants on February 1, 1999, approximately 30 days after the seizure of the Venus account. An analysis of the Sorabe, S.A.

account revealed that out of the approximately 469 originators or beneficiaries of the account, approximately 466 had been originators or beneficiaries of the Venus account before it was seized. These transactions continued until U.S. Customs seized the Harber and Gatex accounts on June 27, 2002.

### COUNTS ONE THROUGH THREE

From on or about June 30, 1997 until at least December 3, 1999, in the District of New Jersey and elsewhere, the Defendants --

1) knowingly conducted financial transactions affecting interstate and foreign commerce involving drug proceeds received from the Glikas Organization and others, knowing that the money represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed to conceal or disguise the source, location, nature, ownership and control of the drug proceeds, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

2) knowingly engaged in monetary transactions by, to and through financial institutions engaged in interstate and foreign commerce involving drug proceeds received from the Glikas organization and others, in violation of Title 18 United States Code, Section 1957; and

3) knowingly transported, transferred and transmitted drug proceeds received from the Glikas Organization and others from a place in the United States to a place outside of the United States, and from places outside of the United States to places in the United States, knowing that the money represented the proceeds of some form of unlawful activity, and knowing that the transportation, transfer and

14

transmission was designed to conceal or disguise the source, location, nature,

ownership and control of the drug proceeds, in violation of Title 18, United States

Code, Section 1956(a)(2)(B)(i).

## GROUP A TRANSACTIONS
## (THE GLIKAS ORGANIZATION)

The amounts set forth below were received from the Glikas Organization and (less the

amount Glikas subtracted as his fee) were presented to various exchange houses in Brazil

including but not limited to Turist-Cambio, a business owned and operated by Antonio Pires de

Almeida and Roseli Ciolfi.  From there, the monies were used in the exchange businesses to cash

checks as well as being sold for other currencies.  These checks were then couried up to the

United States and were deposited, directly or indirectly, into various accounts, including the

EAB Tadeland account, the Beacon Hill Service Corporation account at Chase Manhattan Bank,

and the Venus account at MTB Bank.  The following is a schedule of the drug proceeds involved

in these transactions.

| Approximate Date | Approximate Amount |
|------------------|--------------------|
| June 30, 1997 | $300,000 |
| July 4, 1997 | $450,000 |
| July 15, 1997 | $500,000 |
| July 23, 1997 | $1,050,000 |
| August 6, 1997 | $500,000 |
| August 8, 1997 | $700,000 |
| August 21, 1997 | $520,000 |
| August 25, 1997 | $180,000 |
| August 29, 1997 | $35,000 |

15

| | |
|---|---|
| September 1, 1997 | $865,000 |
| September 8, 1997 | $250,000 |
| September 15, 1997 | $900,000 |
| October 2, 1997 | $350,000 |
| February 11, 1998 | $310,000 |
| February 13, 1998 | $49,500 |
| February 16, 1998 | $5,000 |
| February 19, 1998 | $497,000 |
| TOTAL | $7,461,500 |

## GROUP B TRANSACTIONS
## (SROUR AND THE JAZZ ACCOUNT: $7,636,206.79)

On the following dates, Srour received over 7.6 million dollars in money laundering proceeds into his JAZZ account at MTB Bank. These funds were book transferred to the Venus account in furtherance of Pires' money laundering activities. The deposits at MTB are as follows:

| DATE | AMOUNT | BENEFICIARY | ORIGINATOR |
|---|---|---|---|
| 12/8/97 | 318,076.00 | JAZZ | BHSC/LISCO |
| 12/22/97 | 243,049.00 | JAZZ | BHSC/LISCO |
| 1/6/98 | 103,635.00 | JAZZ | BHSC/LISCO |
| 1/9/98 | 112,106.00 | JAZZ | BHSC/LISCO |
| 1/12/98 | 48,874.00 | JAZZ | BHSC/LISCO |
| 1/13/98 | 145,567.00 | JAZZ | BHSC/LISCO |
| 1/16/98 | 51,797.00 | JAZZ | BHSC/LISCO |
| 1/20/98 | 37,638.00 | JAZZ | BHSC/LISCO |
| 1/21/98 | 118,805.00 | JAZZ | BHSC/LISCO |
| 1/22/98 | 183,415.19 | JAZZ | BHSC/LISCO |
| 1/22/98 | 112,216.00 | JAZZ | BHSC/LISCO |
| 1/23/98 | 109,105.00 | JAZZ | BHSC/LISCO |
| 1/26/98 | 96,510.00 | JAZZ | BHSC/LISCO |
| 1/27/98 | 75,448.00 | JAZZ | BHSC/LISCO |
| 1/29/98 | 52,931.00 | JAZZ | BHSC/LISCO |
| 1/30/98 | 201,800.00 | JAZZ | BHSC/LISCO |
| 2/3/98 | 37,447.00 | JAZZ | BHSC/LISCO |
| 2/4/98 | 60,097.00 | JAZZ | BHSC/LISCO |
| 2/5/98 | 63,000.00 | JAZZ | BHSC/LISCO |
| 2/23/98 | 211,376.00 | JAZZ | BHSC/LISCO |

| DATE | AMOUNT | BENEFICIARY | ORIGINATOR |
|---|---|---|---|
| 2/26/98 | 106,068.00 | JAZZ | BHSC/LISCO |
| 3/2/98 | 232,097.00 | JAZZ | BHSC/LISCO |
| 3/2/98 | 190,820.00 | JAZZ | BHSC/LISCO |
| 3/3/98 | 117,900.00 | JAZZ | BHSC/LISCO |
| 3/13/98 | 144,085.00 | JAZZ | BHSC/LISCO |
| 3/13/98 | 15,864.00 | JAZZ | BHSC/LISCO |
| 3/16/98 | 50,014.00 | JAZZ | BHSC/LISCO |
| 3/17/98 | 156,924.00 | JAZZ | BHSC/LISCO |
| 3/18/98 | 119,221.00 | JAZZ | BHSC/LISCO |
| 3/19/98 | 12,063.00 | JAZZ | BHSC/LISCO |
| 3/23/98 | 256,951.00 | JAZZ | BHSC/LISCO |
| 3/24/98 | 233,315.00 | JAZZ | BHSC/LISCO |
| 3/25/98 | 135,316.00 | JAZZ | BHSC/LISCO |
| 3/26/98 | 82,945.00 | JAZZ | BHSC/LISCO |
| 3/31/98 | 206,873.00 | JAZZ | BHSC/LISCO |
| 4/1/98 | 79,232.00 | JAZZ | BHSC/LISCO |
| 4/3/98 | 65,244.00 | JAZZ | BHSC/LISCO |
| 4/6/98 | 81,708.00 | JAZZ | BHSC/LISCO |
| 4/8/98 | 254,180.00 | JAZZ | BHSC/LISCO |
| 4/10/98 | 61,429.00 | JAZZ | BHSC/LISCO |
| 4/14/98 | 200,000.00 | JAZZ | BHSC/LISCO |
| 4/15/98 | 93,917.00 | JAZZ | BHSC/LISCO |
| 4/17/98 | 318,023.00 | JAZZ | BHSC/LISCO |
| 4/17/98 | 119,499.00 | JAZZ | BHSC/LISCO |
| 4/17/98 | 87,204.00 | JAZZ | BHSC/LISCO |
| 4/24/98 | 93,532.16 | JAZZ | BHSC/LISCO |
| 4/28/98 | 254,502.00 | JAZZ | BHSC/LISCO |
| 4/29/98 | 116,845.15 | JAZZ | BHSC/LISCO |
| 4/30/98 | 142,473.00 | JAZZ | BHSC/LISCO |
| 5/5/98 | 124,572.29 | JAZZ | BHSC/LISCO |
| 5/6/98 | 170,323.00 | JAZZ | BHSC/LISCO |
| 5/7/98 | 234,669.00 | JAZZ | BHSC/LISCO |
| 5/11/98 | 109,603.00 | JAZZ | BHSC/LISCO |
| 5/18/98 | 235,405.00 | JAZZ | BHSC/LISCO |
| 5/20/98 | 110,697.00 | JAZZ | BHSC/LISCO |
| 5/26/98 | 47,236.00 | JAZZ | BHSC/LISCO |
| 6/25/98 | 12,796.00 | JAZZ | BHSC/LISCO |
| 8/19/98 | 89,426.00 | JAZZ | BHSC/LISCO |
| 9/10/98 | 33,580.00 | JAZZ | BHSC/LISCO |
| 10/15/98 | 26,584.00 | JAZZ | BHSC/LISCO |
| 10/19/98 | 30,180.00 | JAZZ | BHSC/LISCO |
|  |  |  |  |
| Total | 7,636,206.79 |  |  |

## GROUP C TRANSACTIONS
## (TRANSFERS FROM JAZZ TO VENUS: $11,665,468,57)

On or about the following dates, Pires received an additional 14 million dollars in drug

proceeds from the Jazz account as follows:

| DATE | AMOUNT | BENEFICIARY | ORIGINATOR |
|------|--------|-------------|------------|
| 12-Jan-1998 | 468,725.52 | VENUS | JAZZ |
| 16-Jan-1998 | 148,041.00 | VENUS | JAZZ |
| 20-Jan-1998 | 40,000.00 | VENUS | JAZZ |
| 20-Jan-1998 | 136,500.00 | VENUS | JAZZ |
| 26-Jan-1998 | 286,539.00 | VENUS | JAZZ |
| 29-Jan-1998 | 434,967.00 | VENUS | JAZZ |
| 30-Jan-1998 | 71,648.00 | VENUS | JAZZ |
| 2-Feb-1998 | 120,750.00 | VENUS | JAZZ |
| 3-Feb-1998 | 144,652.00 | VENUS | JAZZ |
| 4-Feb-1998 | 176,892.00 | VENUS | JAZZ |
| 6-Feb-1998 | 208,153.00 | VENUS | JAZZ |
| 9-Feb-1998 | 633,713.00 | VENUS | JAZZ |
| 10-Feb-1998 | 242,005.00 | VENUS | JAZZ |
| 9-Mar-1998 | 91,800.00 | VENUS | JAZZ |
| 11-Mar-1998 | 254,847.00 | VENUS | JAZZ |
| 13-Mar-1998 | 200,000.00 | VENUS | JAZZ |
| 17-Mar-1998 | 227,160.00 | VENUS | JAZZ |
| 18-Mar-1998 | 100,000.00 | VENUS | JAZZ |
| 23-Mar-1998 | 11,700.00 | VENUS | JAZZ |
| 23-Mar-1998 | 34,903.00 | VENUS | JAZZ |
| 25-Mar-1998 | 47,431.45 | VENUS | JAZZ |
| 26-Mar-1998 | 81,591.00 | VENUS | JAZZ |
| 27-Mar-1998 | 10,000.00 | VENUS | JAZZ |
| 1-Apr-1998 | 63,955.00 | VENUS | JAZZ |
| 3-Apr-1998 | 200,000.00 | VENUS | JAZZ |
| 13-Apr-1998 | 299,500.00 | VENUS | JAZZ |
| 20-Apr-1998 | 150,000.00 | VENUS | JAZZ |
| 24-Apr-1998 | 95,100.00 | VENUS | JAZZ |
| 28-Apr-1998 | 63,601.52 | VENUS | JAZZ |
| 28-Apr-1998 | 68,719.00 | VENUS | JAZZ |
| 29-Apr-1998 | 100,000.00 | VENUS | JAZZ |
| 8-May-1998 | 100,000.00 | VENUS | JAZZ |
| 14-May-1998 | 197,355.00 | VENUS | JAZZ |
| 18-May-1998 | 110,000.00 | VENUS | JAZZ |
| 26-May-1998 | 110,000.00 | VENUS | JAZZ |
| 26-May-1998 | 166,097.00 | VENUS | JAZZ |
| 27-May-1998 | 250,000.00 | VENUS | JAZZ |
| 28-May-1998 | 287,059.00 | VENUS | JAZZ |
| 1-Jun-1998 | 151,763.00 | VENUS | JAZZ |
| 1-Jun-1998 | 400,000.00 | VENUS | JAZZ |
| 8-Jun-1998 | 300,000.00 | VENUS | JAZZ |
| 9-Jun-1998 | 65,597.00 | VENUS | JAZZ |
| 16-Jun-1998 | 100,000.00 | VENUS | JAZZ |
| 22-Jun-1998 | 408,998.00 | VENUS | JAZZ |

| | | | |
|---|---|---|---|
| 26-Jun-1998 | 143,282.00 | VENUS | JAZZ |
| 1-Jul-1998 | 132,060.00 | VENUS | JAZZ |
| 3-Jul-1998 | 223,697.00 | VENUS | JAZZ |
| 7-Jul-1998 | 137,095.00 | VENUS | JAZZ |
| 16-Jul-1998 | 200,000.00 | VENUS | JAZZ |
| 22-Jul-1998 | 150,185.00 | VENUS | JAZZ |
| 27-Jul-1998 | 81,600.00 | VENUS | JAZZ |
| 29-Jul-1998 | 96,200.00 | VENUS | JAZZ |
| 4-Aug-1998 | 115,380.00 | VENUS | JAZZ |
| 12-Aug-1998 | 255,969.00 | VENUS | JAZZ |
| 13-Aug-1998 | 7,859.00 | VENUS | JAZZ |
| 18-Aug-1998 | 799.00 | VENUS | JAZZ |
| 20-Aug-1998 | 55,770.00 | VENUS | JAZZ |
| 9-Sep-1998 | 52,057.00 | VENUS | JAZZ |
| 14-Sep-1998 | 140,093.00 | VENUS | JAZZ |
| 23-Sep-1998 | 95,680.00 | VENUS | JAZZ |
| 2-Oct-1998 | 60,000.00 | VENUS | JAZZ |
| 9-Oct-1998 | 11,226.00 | VENUS | JAZZ |
| 14-Oct-1998 | 327,770.00 | VENUS | JAZZ |
| 16-Oct-1998 | 150,000.00 | VENUS | JAZZ |
| 30-Oct-1998 | 11,030.16 | VENUS | JAZZ |
| 12-Nov-1998 | 51,539.00 | VENUS | JAZZ |
| 16-Nov-1998 | 23,912.00 | VENUS | JAZZ |
| 20-Nov-1998 | 113,581.00 | VENUS | JAZZ |
| 23-Nov-1998 | 37,835.00 | VENUS | JAZZ |
| 23-Nov-1998 | 50,000.00 | VENUS | JAZZ |
| 25-Nov-1998 | 2,757.00 | VENUS | JAZZ |
| 27-Nov-1998 | 278,657.92 | VENUS | JAZZ |
| 1-Dec-1998 | 110,000.00 | VENUS | JAZZ |
| 2-Dec-1998 | 150,000.00 | VENUS | JAZZ |
| 4-Dec-1998 | 10,000.00 | VENUS | JAZZ |
| 4-Dec-1998 | 30,183.00 | VENUS | JAZZ |
| 7-Dec-1998 | 8,176.00 | VENUS | JAZZ |
| 8-Dec-1998 | 6,285.00 | VENUS | JAZZ |
| 8-Dec-1998 | 117,964.00 | VENUS | JAZZ |
| 10-Dec-1998 | 1,898.00 | VENUS | JAZZ |
| 15-Dec-1998 | 20,780.00 | VENUS | JAZZ |
| 16-Dec-1998 | 47,780.00 | VENUS | JAZZ |
| 17-Dec-1998 | 148,400.00 | VENUS | JAZZ |
| 23-Dec-1998 | 153,492.00 | VENUS | JAZZ |
| 29-Dec-1998 | 4,714.00 | VENUS | JAZZ |
| Total | 11,665,468.57 | | |

Pursuant to Title 18, United States Code, Section 1956(b), the Defendants are liable for a civil penalty equal to the sum of the above-listed amounts $26,763,175.36, that being the value of the property, funds or monetary instruments involved in the violations of Title 18, United States Code Sections 1956(a)(1) and (2) and 1957 alleged herein.

19

WHEREFORE, Plaintiff, the United States of America, demands judgment in the

amount of **$26,763,175.36**.

JOHN ROTH
Chief, Asset Forfeiture Money
Laundering Section

By: _____
STEFAN D. CASSELLA
Assistant Chief, Asset Forfeiture
Money Laundering Section

CHRISTOPHER J. CHRISTIE
United States Attorney for the
District of New Jersey
Attorney for Plaintiff

By: _____
PETER W. GAETA
Assistant United States Attorney

Dated: January 12, 2004
       Newark, New Jersey