CLOSED

# U.S. District Court
# District of New Jersey [LIVE] (Newark)
# CRIMINAL DOCKET FOR CASE #: 2:02-mj-03090-MF-1

Case title: USA v. NOLASCO, et al                    Date Filed: 06/26/2002

Assigned to: Magistrate Judge Mark Falk

### Defendant (1)

**MARIA CAROLINA NOLASCO**            represented by   **CATHY L. WALDOR**
*TERMINATED: 09/07/2004*                                WALDOR & CARLESIMO, ESQS.
                                                        2517 HIGHWAY 35
                                                        BUILDING L
                                                        SUITE 101
                                                        MANASQUAN, NJ 08736
                                                        (732) 528-5040
                                                        Email: clwaldor@verizon.net
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*
                                                        *Designation: Retained*

**Pending Counts**                                      **Disposition**

None

**Highest Offense Level (Opening)**

None

**Terminated Counts**                                   **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                          **Disposition**

COMPLAINT: Money Laundering 26:7201

**EXHIBIT L**

**Plaintiff**

**USA**    represented by    **MARION PERCELL**
US ATTORNEY'S OFFICE
970 BROAD STREET
ROOM 700
NEWARK, NJ 07102
(973) 645-2733
Fax: (973) 645-3316
Email: marion.percell@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/26/2002 | 1 | COMPLAINT as to MARIA CAROLINA NOLASCO, TURIST-CAMBIO VIAGENS 4 TURISMO, LTDA (me) (Entered: 07/17/2002) |
| 06/26/2002 | | ARREST WARRANT issued as to MARIA CAROLINA NOLASCO (me) (Entered: 07/17/2002) |
| 06/26/2002 | 2 | SEALING ORDER as to MARIA CAROLINA NOLASCO, TURIST-CAMBIO VIAGENS 4 TURISMO, LTDA ( Signed by Mag. Judge Stanley R. Chesler ) (me) (Entered: 07/17/2002) |
| 06/27/2002 | | ARREST of MARIA CAROLINA NOLASCO (me) (Entered: 07/17/2002) |
| 06/27/2002 | 3 | Minutes of 6/27/02 before Mag. Judge Stanley R. Chesler as to MARIA CAROLINA NOLASCO, Initial Appearance held. Preliminary Hearing set for 2:00 7/17/02 for MARIA CAROLINA NOLASCO ; (Defendant informed of rights.) , Bond set to $250,000 posting property. for MARIA CAROLINA NOLASCO. Public Defender appointed for today only. Deft. to retain Counsel. (Court Reporter/ESR: court tape 02-11) (me) (Entered: 07/17/2002) |
| 06/27/2002 | 4 | CJA 23 FINANCIAL AFFIDAVIT by MARIA CAROLINA NOLASCO (me) (Entered: 07/17/2002) |
| 06/27/2002 | 5 | ORDER Setting Conditions of Release as to MARIA CAROLINA NOLASCO Bond reset to $250,000 posting property. for MARIA CAROLINA NOLASCO. ( Signed by Mag. Judge Stanley R. Chesler ) (me) (Entered: 07/17/2002) |
| 06/27/2002 | 20 | "Clerks Note: Entry Made for Computer Purposes" Minute Entry for proceedings held before Judge Stanley R. Chesler :Initial Appearance as to MARIA CAROLINA NOLASCO held on 6/27/2002 (tl, ) (Entered: 09/07/2004) |
| 06/28/2002 | | BAIL/BOND executed by MARIA CAROLINA NOLASCO in Amount $ @50,000 posting property. Forfeit and Justification attached. (me) (Entered: 07/17/2002) |
| 06/28/2002 | 6 | Waiver of Preliminary Hearing by MARIA CAROLINA NOLASCO (me) (Entered: 07/18/2002) |

| | | |
|---|---|---|
| 07/31/2002 | 7 | ORDER as to MARIA CAROLINA NOLASCO, to Continue in Interests of Justice Time Excluded from 7/27/02 to 8/26/02 ( Signed by Mag. Judge Stanley R. Chesler ) (me) (Entered: 08/05/2002) |
| 09/03/2002 | 8 | ORDER as to MARIA CAROLINA NOLASCO, to Continue in Interests of Justice Time Excluded from 8/26/02 to 9/2502 ( Signed by Mag. Judge Stanley R. Chesler ) (me) (Entered: 09/04/2002) |
| 10/01/2002 | 9 | ORDER as to MARIA CAROLINA NOLASCO, to Continue in Interests of Justice Time Excluded from 9/25/02 to 10/25/02 ( Signed by Mag. Judge Stanley R. Chesler ) (me) (Entered: 10/02/2002) |
| 10/01/2002 | 10 | ORDER MODIFYING BAIL CONDITIONS as to MARIA CAROLINA NOLASCO ( Signed by Mag. Judge Stanley R. Chesler ) (me) (Entered: 10/02/2002) |
| 10/25/2002 | 11 | ORDER as to MARIA CAROLINA NOLASCO, to Continue in Interests of Justice Time Excluded from 10/25/02 to 11/24/02 ( Signed by Mag. Judge Stanley R. Chesler ) (me) (Entered: 10/29/2002) |
| 02/03/2003 | 12 | ORDER as to MARIA CAROLINA NOLASCO, to Continue in Interests of Justice Time Excluded from 01.22.03 to 03.23.03 ( Signed by Magistrate Judge Mark Falk ) (ej) (Entered: 02/05/2003) |
| 03/21/2003 | 13 | ARREST WARRANT Returned Executed as to MARIA CAROLINA NOLASCO on 6/27/02 (ej) (Entered: 03/21/2003) |
| 06/11/2003 | 14 | ORDER as to MARIA CAROLINA NOLASCO, to Continue in Interests of Justice Time Excluded from 03.23.03 to 08.20.03 ( Signed by Magistrate Judge Mark Falk ) (ej) (Entered: 06/11/2003) |
| 08/19/2003 | 15 | ORDER as to MARIA CAROLINA NOLASCO, to Continue in Interests of Justice Time Excluded from 08.20.03 to 10.19.03 ( Signed by Magistrate Judge Mark Falk ) (ej) (Entered: 08/19/2003) |
| 04/29/2004 | 16 | ORDER TO CONTINUE - Ends of Justice as to MARIA CAROLINA NOLASCO Time excluded from 10/19/03 until 6/15/04. . Signed by Judge Mark Falk on 4/29/04. (mm, ) (Entered: 04/29/2004) |
| 06/25/2004 | 17 | ORDER TO CONTINUE - Ends of Justice as to MARIA CAROLINA NOLASCO Time excluded from 6/15/04 until 7/15/04. Signed by Judge Mark Falk on 6/25/04. (mm-sl, ) (Entered: 06/25/2004) |
| 07/21/2004 | 18 | ORDER TO CONTINUE - Ends of Justice as to MARIA CAROLINA NOLASCO Time excluded from 7/15/04 until 8/14/04. Signed by Judge Mark Falk on 7/21/04. (mm-sl, ) (Entered: 07/22/2004) |
| 08/12/2004 | | Judge update in case as to MARIA CAROLINA NOLASCO, TURIST-CAMBIO VIAGENS 4 TURISMO, LTDA. Judge Mark Falk added. Judge S. R. Chesler and S. R. Chesler no longer assigned to case. (mm-sl, ) (Entered: 08/16/2004) |
| 08/13/2004 | 19 | ORDER TO CONTINUE - Ends of Justice as to MARIA CAROLINA NOLASCO |

Time excluded from 8/14/04 until 9/13/04. Signed by Judge Mark Falk on 8/13/04.
(mm-sl, ) (Entered: 08/16/2004)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/24/2010 15:16:46 | | | |
| **PACER Login:** | rd2689 | **Client Code:** | 1032.003 |
| **Description:** | Docket Report | **Search Criteria:** | 2:02-mj-03090-MF Start date: 1/1/1970 End date: 9/24/2010 |
| **Billable Pages:** | 2 | **Cost:** | 0.16 |

CHRISTOPHER J. CHRISTIE
United States Attorneys Office
PETER W. GAETA
Assistant United States Attorney
970 Broad Street
Newark, New Jersey 07102
(973) 645-2927
PWG - 4990

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | HON. JOHN W. BISSELL |
| -v- | : | Civil Action No: 00 - 2667 |
| | : | AMENDED VERIFIED |
| $8,221,877.16 IN UNITED STATES CURRENCY REPRESENTING: | : | COMPLAINT FOR FORFEITURE |
| $6,871,042.36 CONTAINED IN ACCOUNT NUMBER 030101107 KNOWN AS THE VENUS ACCOUNT, HELD IN THE NAME OF OR FOR THE BENEFIT OF KESTEN DEVELOPMENT CORP. AT MTB BANK; | : : : : | |
| $1,345,771.64 CONTAINED IN ACCOUNT NUMBER 12108 KNOWN AS THE TADELAND ACCOUNT HELD AT FOREX ASSOCIATES WHICH MAINTAINS AN ACCOUNT AT EAB BANK; and | : : : : | |
| $5,063.16 CONTAINED IN ACCOUNT NUMBER 08-1641-3 IN THE NAME OF OR FOR THE BENEFIT OF RAMAL VENTURES AT ISRAELI DISCOUNT BANK, | : : : | |
| Defendants-in-rem. | : | |

1

EXHIBIT M

The United States of America, acting by and through its attorney Christopher

J. Christie, United States Attorney for the District of New Jersey, (Peter W. Gaeta, Assistant

United States Attorney, appearing), files this amended verified complaint for civil forfeiture in

rem and alleges upon information and belief that:

## I. JURISDICTION AND VENUE

1.  This is a civil in rem action brought to enforce the provisions of Title 18, United

States Code, Section 981, et seq., which provides for the forfeiture of any property, real or

personal, involved in a transaction or attempted transaction in violation of Title18, United States

Code, Section 1956 and Title 18, United States Code, Section 1957.

2.  This Court has jurisdiction under the provisions of Title 28, United States Code,

Sections 1345 and 1355.

3.  Venue lies in the United States District Court for the District of New Jersey under

the provisions of Title18, United States Code, Section 981(h) and Title 28, United States Code,

Sections 1355(b) and 1395.

4.  The subject matter of this action is $8,221,877.16 in United States currency

(hereinafter the "defendant currency") which was seized as follows: $6,871,042.36 contained in

account number 030101107 known as the Venus Account, held in the name of or for the benefit

of Kesten Development Corp. at MTB Bank[1]; $1,345,771.64 contained in account number 12108

known as the Tadeland account held at Forex Associates which maintains an account at EAB

---

[1] Funds from this seized account were delivered to the United States as follows: $6,043,130.40 on
January 14, 1999; $188,745.47 on January 20, 1999; $269,375.36 on January 29, 1999;
$90,978.80 on February 5, 1999; $18,166.00 on March 10, 1999; $30,646.20 on March 10, 1999;
$6,211.06 on April 27, 1999; $120,243.00 on May 17, 1999; $9,082.07 on August 6, 1999; and
$94,464.00 on December 3, 1999.

Bank; and $5,063.16 contained in account number 08-1641-3 in the name of or for the benefit of Ramal Ventures at Israeli Discount Bank.

## II. BACKGROUND ON THE BLACK MARKET

5.      South America is the world leader in the production of cocaine and the United States has the world's largest cocaine market. South American countries produce heroin as well. Both cocaine and heroin are smuggled into the United States by South American drug traffickers and sold here almost exclusively for United States dollars. Accordingly, drug traffickers accumulate a vast amount of United States currency (cash) in the United States.

6.      The drug trafficker must then store, transport and integrate into the stream of commerce his huge quantities of cash. In cocaine cases, for example, the drugs themselves are easily packaged, concealed and transported, but if the proceeds of cocaine trafficking are received in "street money," (i.e., equal numbers of 5, 10 and 20 dollar bills) the money will weigh 3 ½ times as much as the cocaine, making it much harder to handle in a clandestine manner. This presents the drug trafficker with a serious logistical problem.

7.      A legitimate businessman who took in a large quantity of cash from a grocery store, restaurant or other cash generating business would simply deposit the cash in a bank. There is no advantage to such a person in keeping hoards of cash in his possession. A drug dealer, however, simply cannot do that because in depositing his money in a bank he will create a paper trail - the Currency Transaction Report (CTR) that all banks are required to file pursuant to 31 U.S.C. 5313 - detailing his identity and the time, place and amount of his cash transaction. Creating such a paper trail exposes a drug trafficker to detection by law enforcement. Because of the government's success in enforcing the CTR and other requirements of the Bank Secrecy Act

3

(31 U.S.C. § 5312 *et seq.*), drug dealers and other criminals are forced to conceal and transport their money outside of the banking system. One of the most common methods is the "Black Market" exchange also known as the "Parallel Market" (hereinafter the "Black Market").

8.     A drug trafficker must accomplish two fundamental goals to operate his narco-business interests. First, he must be able to access his profits in order to be able to pay expenses for the ongoing operation and he must also be able to establish methods for eventually sharing in the profits. To share in drug proceeds, he must be able to justify his wealth to ward off oversight and investigation into the origins of his wealth so as to avoid arrest, seizure, forfeiture and taxation of his monies. The process of accomplishing these goals is the "money laundering" cycle in which the Black Market plays a key role.

9.     The money laundering cycle attempts to establish total anonymity for the participants by introducing the drug proceeds into the financial markets in such a way as to promote the carrying on of the unlawful activity, or, to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity. This activity is often accomplished when businesses, which on the surface appear legitimate, are involved in the transactions so as to facilitate the laundering of the proceeds.

10.     The "Black Market" is a community of currency exchange brokers operating outside the established banking system in South America. These brokers facilitate the exchange of proceeds from the sale of narcotics for local currencies or other forms of negotiable instruments. These people who facilitate these exchanges are currency brokers, or, as they are known to law enforcement officials, "money exchangers." Many money exchangers have developed a system to bypass the banking systems within their countries and the scrutiny of the

4

authorities, and are able to deal directly with drug traffickers who wish to sell their U.S. obtained narco-dollars.

11.     Money exchangers deal directly with drug traffickers in negotiating exchange rates for the U.S. dollars. That is, traffickers need local currencies as well as non-cash U.S. dollar denominated instruments. The local currency provides for the drug dealer's need in their homelands, and non-cash instruments, denominated in U.S. dollars, provides a means for the drug dealer to get his narco-proceeds into the United States and international financial system without detection by law enforcement agencies, something which the deposit of U.S. cash may cause. Therefore, the money exchanger offers to purchase or exchange local currencies and U.S. negotiable instruments for the narco-dollars.

12.     Upon an agreement, the local currency is paid to the drug trafficker by the money exchanger who also has other customers in need of U.S. dollars. To meet this demand the exchanger must convert the narco-dollars into other U.S. dollar instruments such as travelers checks, payroll checks and personal checks. The drug trafficker contacts his groups in the United States and elsewhere who control the narcotics proceeds or cash. The drug trafficker's narco-money manager is then instructed by the drug trafficker to deliver the agreed upon amount of U.S. cash to the U.S. based agent of the money exchanger. This is performed via a system of using pagers, pay telephones, and cellular telephones frequently using coded communication. Upon the delivery of the cash by the drug trafficker's money manager to the money exchange representative, the drug trafficker is finished with the first aspect of the money laundering process. Typically, a bulk movement of U.S. cash to a foreign location occurs in a concealed manner carried by individuals or shipped in some form of container. Drug proceeds are also

5

laundered through checking accounts in the United States where the proceeds are deposited below $10,000.00 to avoid a CTR filing and detection by law enforcement. The U.S. dollar denominated checks are then used in the Black Market to further the money laundering activity. Also, unwitting individuals who have wire transferring as well as foreign exchange needs may find their U.S. checking accounts used in the money laundering activity.

13.    The money exchanger knows approximately the amount of U.S. dollars he wishes to exchange/purchase from the drug traffickers. The money exchanger knows this because they or another intermediary exchanger who has received requests from businessmen seeking to purchase dollar payment instruments for their businesses. That is, these businessmen wish to purchase goods for resale in their businesses. The businessmen are paying their vendors in the United States for these goods, and, generally vendors in the United States want to be paid in U.S. dollar denominated instruments. The money exchanger uses his relationship with the drug trafficker to find this necessary capital. He then uses his relationships with other Black Market exchange houses throughout South America to convert or change the form of the capital from cash to checks delivered by these same Black Market exchange houses in need of the cash. Upon receiving dollar denominated checks, the money exchanger delivers these vast sums of checks to banks, wire remitters and foreign exchange agents in the United States or other venues willing to accept these instruments. In turn, these instruments are deposited into bank accounts. Once these checks have been deposited the payments are then made by the money exchanger to vendors supplying goods such as electronics, gold, medical equipment and so on. The drug trafficker will also have some of the converted cash proceeds wired into accounts he holds anywhere in the world so as to further facilitate his drug trafficking and lavish lifestyle.

6

14.     Once the businessmen receive their goods for resale the goods are sold and the local funds are delivered back to the money exchanger for the money laundering/exchange cycle to continue. In turn, it is this local currency that is constantly replenishing the local currency account of the money exchanger, who at the start of the cycle, reduced his local currency account to pay the drug trafficker for the purchase of the U.S. narco-dollars.

15.     Once in possession of the checks, the money exchanger may seek to deposit those checks into designated bank accounts. The checks are traditionally bought on the Black Market without the "payee" section filled in on the check. This allows the launderer/exchanger to fill in the name of the institution he is delivering the checks to without creating the appearance of the check being a third party instrument. The money launder/exchanger controlling the actions of his agent or courier, will designate which accounts to deposit the checks into. Upon those instructions, the money launderer will deliver the checks to those institutions accepting them and credit the appropriate accounts. The acceptance of these checks by the institutions completes another phase of the money laundering cycle, namely, the delivery of narcotics proceeds into a banking institution while avoiding the transaction reporting requirement in violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii) and (a)(2)(B)(ii).

16.     An example of the Black Market exchange is illustrated as follows with the accompanying diagrams: A drug trafficker has a large quantity of cash in the United States - ie: $1 million in the proceeds of drug sales - in a stash house.① What he really needs is the local currency in the country he resides where he can spend the money for labor, raw material, equipment, and to live a luxurious life style.② To handle this task, the drug dealer looks to a money exchanger, also known as a money broker or *casa de cambio*.③ Money exchangers

7

operate businesses throughout South America exchanging local currency for U.S. dollars. In this scenario, the drug trafficker sells the money exchanger the money in the stash house for local currency. The top half of the diagram, shown below, illustrates this exchange. When it is completed, the dollars in the stash house belong to the money exchanger, who has paid for them with local currency delivered to the drug trafficker in South America. The beauty of this scheme is that at the earliest stage, the drug trafficker is totally out of the picture. He has received what he wanted (local currency at home) and transferred the problem (the stash of U.S. dollars) to the money exchanger who is now responsible for the money still in the U.S. The money exchanger does not want to keep this money, of course. His business involves buying and selling U.S. dollars and local currency to people who need them - people like South American businessmen who need U.S. dollars to pay a 3rd party or designee for imported goods and drug traffickers who need local currency.



17.    A South American businessman who needs dollars to pay for his imports could go to a local bank and buy dollars at the lower official exchange rate through the countries central bank and have that amount reported to local Customs officials as an importation of goods. However, the official rate is always higher or more costly than the Black Market rate. Accordingly, the South American businessman will do better if he goes to the money exchanger and buys dollars that the money exchanger has obtained via smuggling from a drug trafficker and forgo having his importation reported to Customs and get a lower, or, less costly rate then the official exchange rate. For example, a South American businessman might pay $900,000.00 in local currency for $1 million in U.S. narco- dollars. The South American businessman is satisfied because he got a better rate then the official rate through a bank. The money exchanger is satisfied with this deal, of course, because he may have paid only $800,000.00 for the money he has now sold for $900,000.00 due to the illegal source of the funds. Additionally, the money exchanger will earn interest on the "float" of the monies held on deposit at the U.S. banks that he eventually sells to the South American businessman which will be later used to conclude the transaction. The "float" is the time period from when the monies are deposited into an account until their subsequent transfer out. During this time period the account holder can use the deposits to earn interest on these funds before they are transferred from the account. The longer the "float" the greater amount earned by the money exchanger.

18.    The South American businessman now has U.S. dollars to pay off the invoices he has received from the exporters in the U.S. and elsewhere who have shipped him goods. So the businessman instructs the money exchanger to send the dollars to a designee (the exporter) in the U.S., or Italy, or Hong Kong, or some other place. The diagram on page 8 shows the transaction

9

being completed when the money exchanger delivers the dollars to the South American businessman's designee[5].

19.     Everyone involved benefits with this arrangement. The drug trafficker has his money at home, the importer has paid for his goods (with discounted dollars) at a better rate not reported to Customs, the exporter has been paid for his exports and the money exchanger has made a handsome profit through discounting currency and interest off the float of monies he controls in U.S. banks. (Because, as the diagram illustrates, there are several sets of parallel transactions going on here, the black market is sometimes referred to as the "parallel market.")

20.     Once the drug proceeds, which the money exchanger/launderer has converted to check form, are accepted and deposited into a banking institution or with a money remitter in the U.S., the corresponding credit is available for use. The type of accounts which receive these high volume deposits may be established as either personal or commercial accounts by the bank even though it is clear that the level of transaction activity is, at the very least, commercial in nature but often rises to a volume more consistent with bank to bank institutional activity. Now the narco-proceeds, in another form, a credit in a bank account, are available for use. These accounts will now facilitate the movement of the narco funds in concert with the intended purpose as established by the account holder's position within the money laundering cycle.

21.     The diagram on page 8 is oversimplified in one sense: it glosses over the most difficult part of the operation for the money exchanger - converting the dollars he has acquired in

the stash house (in the upper left of the diagram) into funds he can use to pay the third party or his designee (in the lower left). The following diagram expands this left half of the operation to illustrate how the money exchanger accomplishes this conversion.



### How the Money Exchanger Gets the Dollars to the Third Party

22.    The money exchanger has several ways in which to turn his hoard of cash into useable funds. First, he can "smurf" the money into his U.S. bank account. (Almost all money exchangers maintain U.S. bank accounts to facilitate dollar transactions.)  "Smurfing" is the art of turning cash into monetary instruments, such as money orders or travelers checks, or into

bank deposits, in amounts under $10,000.00 so as not to generate a Currency Transaction Report. "Smurfing" is slow and labor-intensive, but it is still done.

23.   Second, the money exchanger can collaborate with a U.S.-based money remitter to have the money wired to a designated bank account overseas. Money remitters are commonplace in many neighborhoods throughout the United States and conduct a legitimate business sending money to foreign countries on behalf of immigrants who desire to send the money home to their families. Thus, money remitters are already engaged in a high-volume cash business, and can easily disguise the money received from the money exchanger as legitimate funds destined for immigrant families "back home." Of course, the money, as the remitter well-knows, is actually drug proceeds that, for a fee, the remitter is willing to deposit in his own U.S. bank account and wire to the money exchanger's bank account abroad. When this is accomplished, the money exchanger has his money in a foreign bank.

24.   Finally, and perhaps most commonly, the money exchanger can simply smuggle the cash out of the United States by means of a courier, container ship, airplane or some other means. The smuggling usually occurs in several stages: a courier picks up a load of cash at the stash house, or accepts delivery of cash at a neutral site such as a hotel, and transfers the money to another courier; the second courier mails, ships or physically transports the cash to another courier in a place on the southwest border, or a city with a major airport or shipping port with a high volume of traffic bound for South America; finally, the last courier (or a courier organization who divide up the money to reduce the risk of loss) either carries the money physically across the border, conceals it among exported goods, or boards a commercial airline flight and flies with the currency in his or her luggage or under clothing.

12

25.     Once the currency has been smuggled out of the country, the money exchanger has some options. He could possibly deposit the money in a foreign bank and wire it to his account in the U.S., or directly to the third-party's designee. He could use it to buy foreign bank drafts - essentially cashiers checks written on the bank's own correspondent account in the U.S. - and then deposit the bank drafts into his own account or deliver them to the third party's designee. Or he can, through a more complex process, which insures greater anonymity for the money launderer, use the cash to buy dollar denominated personal checks, money orders and travelers checks and then send those instruments back to the United States, layer the deposits through nominee accounts to further conceal his identity and finally transfer them into his own account for payment anywhere in the world. (The payee field on checks and money orders are left blank so they do not appear to be a third party instrument which makes them easier to negotiate at a later date). It is not unusual for millions of dollars in the form of bank drafts and sequentially numbered personal checks, travelers checks and money orders to pass through the U.S. bank account of a large scale money launderer. The following diagram illustrates this process:



26.    In sum, through this process, or some variation thereof, the money exchanger

performs his task of converting a stash house full of cash into funds that he can easily transfer to

an exporter designated by a South American businessman as the designated recipient of the U.S.

dollars the businessman has purchased from the money exchanger.

14

27.   The payment services offered by such accounts are operating in the United States as remitters of funds.  Certain states require such services to be licensed under state law and are placed under banking regulator oversight.  In those instances where a state or federal licensing requirement is not fulfilled, then those persons using such accounts for these commercial activities are subject to criminal prosecution under Title 18, United States Code, Section 1960.  If the remitters, using the above described accounts, were properly licensed, then appropriate government oversight, which has been established to prevent the illegal use of U.S. financial markets, would review account activity and investigate appropriately.  Similar in nature to the avoidance of filing a Currency Transaction Report ("CTR"), money launderers do not want to be identified in their facilitation of the movement of monies, and in turn, avoid obtaining proper licensing in the United States.

## III.  FACTS OF THE CASE

28.   The funds seized in this case were funds taken from the bank accounts of various money exchangers who were using those accounts to launder the proceeds of drug trafficking through the Black Market Exchange.  Such money laundering activity is in violation of Title 18, United States Code, Sections 1956(a)(1), 1956(a)(2) and 1957.  All property involved in a transaction in violation of those statutes, or a conspiracy to violate those statutes in violation of Section 1956(h), is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A).

29.   The evidence establishing that the defendant funds represent property involved in a money laundering offense may be summarized as follows.

15

## A. The Glikas Organization

30.     In the course of numerous investigations in the New York City/New Jersey

metropolitan area, the Drug Enforcement Administration (DEA) has determined that one Ernesto

Ceballos (hereinafter "Ceballos") is the leader of a major drug organization responsible for

distributing thousands of kilograms of cocaine into the United States from South America.

Ceballos operates his sophisticated drug operation from South America and employs workers in

the New York metropolitan area who are responsible for receiving narcotics from Ceballos and

arranging for the transportation of narcotics proceeds out of the United States back to South

America.

31.     Ceballos was indicted for drug trafficking offenses in 1992 in the <u>People v. Luis</u>

<u>Barrera</u>, CT92-0102 (N.Y. Sup. Ct., 1992), for his distribution of multi-kilogram amounts of

cocaine. He remains a fugitive on this indictment and continues to run his drug operation from

Colombia. He is responsible for the importation of more than 15,000 kilograms of cocaine per

year.

32.     The DEA investigations also determined that one Marcos Glikas (hereinafter

"Glikas"), a money exchanger in Sao Paolo, Brazil, was laundering money for the Ceballos

organization and other drug traffickers through the Black Market Exchange. Glikas operated a

business known as Miratur which employed, among others, the following individuals: Tania

Schahanof, a/k/a "Ana" (hereinafter "Schahanof"), Alberto Kern, (hereinafter "Kern") and

Ricardo Amaral a/k/a "Magro" (hereinafter "Amaral"). The investigation showed that these

individuals were responsible for picking up the drug proceeds from stash houses, arranging for

the transportation of the money via couriers, smuggling the money out of the United States, and,

16

ultimately, repatriating the money in other forms such as bundles of personal checks into the bank accounts maintained by Glikas and other money exchangers in the United States in furtherance of the money laundering activity.

33.    The money laundering operation operated on an enormous scale. Schahanof's function was to come to the United States to manage and receive narcotics proceeds from various individuals. Upon receiving the funds, Schahanof would verify the amount and contact Glikas who would then have couriers travel from Brazil to the United States to meet with Schahanof, who in turn was instructed to turn over the proceeds to the couriers for delivery back to Brazil. Schahanof was in effect the "stash manager" for the money laundering organization. Investigation by the DEA has revealed that on average Schahanof would receive two deliveries per day from various drug organizations totaling approximately $600,000.00 per day during her many stays in the United States.

34.    Amaral functioned as a courier. He smuggled some of the currency collected by Schahanof out of the United States, and was responsible for physically transporting huge quantities of third-party checks back into the Unites States after the smuggled currency had been converted into that form. He then deposited the funds into bank accounts designated by Glikas.

35.    U.S. Customs documents indicate that Amaral transported approximately $824,000.00 in cash during nine trips from the United States to Brazil over a 12 month period from January 1997 through December 1997. Also, during the period from January 1996 though April of 1998, Amaral entered the United States 76 times and declared approximately $90,970,194.00 in third party checks which he listed as belonging to Glikas and/or Glikas' company, Miratur. In particular, between January 6, 1998 through April 24, 1998, Amaral made

17

13 trips to the United States and declared $22,214,041.00 dollars in the form of personal checks, cashier checks, money orders and traveler checks.

36.     Schahanof and Amaral also coordinated their activities with each other. Typically, at the same time that Amaral was entering the United States with third party checks, Schahanof was managing the transportation of drug proceeds out of the country. For example, on February 4, 1998, Schahanof was exiting the country while Amaral was entering with $1,884,061.00 in checks. On February 19, 1998 Schahanof was exiting the country while Amaral was entering with $2,283,684.00 in checks. Schahanof was briefly detained on March 3, 1998, and $757,410.00 in cash was seized from her at the Doral Inn. However, telephone intercepts reveal that she was to stay at the Doral until March 5th. On March 4, 1999, Amaral entered the United States with $2,072,198.00 in checks. On April 14, 1998, Schahanof entered the United States and on April 15, 1998 she exited. On April 15, 1998, Amaral entered the United States with $2,044,393.00 in checks.

37.     This coordinated activity provided control over the drug proceeds. By staggering their entries and exits, members of the Glikas organization minimized the potential for detection, maintained the needed revenue flow, and avoided having to have different couriers traveling together at the same moment.

38.     Glikas and Kern were convicted of money laundering on March 19, 1999. United States v. Marcos Glikas, et al., Criminal number: 98-265. Amaral was indicted on money laundering charges and pled guilty to a violation of Title 18, United States Code, Section 4. Schahanof was indicted on money laundering charges but remains a fugitive.

18

B.    Transactions in February and March of 1998

39.    The following is an example of how the Glikas organization laundered drug proceeds obtained from the Ceballos organization and others through Brazilian money exchangers.  On February 10, 1998, Glikas entered the United States from Brazil via American Airlines at John F. Kennedy Airport in New York.  Glikas proceeded to call the Roosevelt Hotel in New York where an individual identified as Miguel Suarez, a/k/a "Boris" (hereinafter "Suarez"), a member of the Ceballos organization, was staying.  Just prior to Glikas entering the country, Suarez was the subject of a court-ordered wiretap performed by the DEA, Newark Field Division, wherein it was learned that he was arranging to receive a delivery of $200,000.00 in narcotics proceeds from a member of the Ceballos organization.  That money was to be delivered to Suarez at the Roosevelt Hotel.

40.    On  February 11, 1998, Ceballos contacted Jose Mejia, a/k/a "Nino" (hereinafter "Mejia"), a member of his organization, and told him to arrange for the delivery of approximately $300,000.00 in drug proceeds.  Intercepted conversations showed that Mejia subsequently contacted Glikas and arranged the delivery of money from the Ceballos organization to him. Schahanof checked into the Roosevelt Hotel on February 12, 1998.

41.    On or about March 2, 1998, Schahanof again arrived in the United States and received approximately $400,000.00 in narcotics proceeds from an individual identified as Manuel Pacheco, an employee of Alberto Kern.  On March 3, 1998, Schahanof received another delivery of approximately $57,000.00 from Kern that he had been holding for Glikas, and another $290,000.00 from a narcotics trafficker named Inocencio Lopez, a/k/a "Oscar Jimenz," a/k/a "Cezar" (hereinafter "Lopez"), at the Doral Hotel. Lopez was employed by a Colombian

19

cell run by "El Tio." Lopez had been telephonically intercepted calling the cell phone which

Schahanof had in her possession. Through intercepted conversations of this drug cell member

and his organization, NYDETF seized 56 kilograms of cocaine and arrested three narcotics

traffickers. Their investigation revealed that the money delivered to Schahanof was narcotics

proceeds. It was further revealed that members of the Glikas money laundering organization had

received narcotics proceeds on a previous occasion from this same drug cell. Additional

telephone intercepts establish that other individuals were discussed during this period including

persons identified as Williams, Seth, and Magro who worked directly for the Glikas organization

for the purpose of picking up narcotics proceeds for delivery to Glikas in Brazil.

    42.    Shortly after the Lopez delivery, DEA agents raided Schahanof's hotel room and

seized approximately $757,410.00. Schahanof was not arrested at this time so that the DEA

could further their investigation to discover who her superiors were in Brazil. Immediately after

the seizure, Schahanof spoke with Glikas and informed him that individuals identifying

themselves as the police entered the room and took the suitcase containing the money.

Subsequent telephone calls from Glikas and another associate, Flavio Suares, revealed their

belief that Schahanof had been robbed by other drug traffickers posing as police officers. After

the seizure, Flavio Suares, on behalf of Glikas, instructed Schahanof to "clear her head" and to

set up at another location to receive additional narcotics proceeds. Subsequent to this seizure the

cell phone held by Schahanof was continually monitored (hereinafter, the "Brazilian cell

phone").

    43.    After the seizure of $757,410.00, Schahanof continued to receive calls on the

Brazilian cell phone involving the delivery of additional monies. Because of the seizure,

however, Glikas called off these additional deliveries to avoid detection by law enforcement and ordered Schahanof back to Brazil.

44.     At the time of Schahanof's detention, a portion of the money she had in her possession was wrapped in carbon paper. Individuals engaged in smuggling money out of the country commonly use carbon paper to cover the money in the belief that the carbon paper shields the cash from detection by scanning equipment.

45.     Schahanof was later interviewed by DEA agents in Sao Paulo, Brazil. During the interview Schahanof stated that cash delivered to her in the New York hotel rooms was taken from New York and delivered directly to Glikas in Brazil. Schahanof entered the United States at least eight times from July 1997 through April 1998 for the sole purpose of receiving narcotics proceeds and managing the delivery of these proceeds to the Glikas money laundering organization in Brazil. Schahanof also stated that she usually stayed in the United States between two (2) days and two (2) weeks and typically received approximately $300,000.00 per delivery.

C.     **Relationship between Glikas and the Defendant Funds**

46.     In the course of his money laundering operation, Glikas would distribute the drug proceeds to other money exchangers in Brazil and elsewhere. In effect, Glikas operated as a wholesaler courier/supplier of drug proceeds to commercial clients who needed dollars to conduct their own money exchange businesses. In particular, the Glikas organization delivered drug proceeds to at least two other individuals who operated money exchange businesses in Sao Paolo, Brazil: Antonio Pires de Almeida (hereinafter "Pires") and Antonio Claramunt, a/k/a "Tonino" (hereinafter "Claramunt").

21

47.     Pires and Claramunt are engaged in the business of cashing dollar denominated checks at a discount.  To conduct these businesses, Pires and Claramunt need a constant supply of U.S. dollars.  The Glikas organization provided these dollars to Pires and Claramunt as part of the money laundering operation.  Pires and Claramunt would then use the narco-dollars acquired from Glikas to cash dollar-denominated checks, and would sell the checks to persons seeking cash for Brazilian Reals.[2]

48.     Pires and Claramunt would also sell customers, as part of the money laundering cycle, a payment in the form of a U.S. dollar denominated wire transfer to wherever it was the customer was seeking the payment to be delivered.  These exchange services, whether by check or wire, are dependant on a regular cash flow of dollars in order to be able to engage in U.S. dollar denominated transactions.  Therefore, Glikas' access to large sums of discounted narco - dollars placed him in a vital position to support these ongoing business enterprises.

49.     Evidence further demonstrating Glikas relationship with Pires and Claramunt was discovered during Glikas' arrest wherein a note was found indicting dollar amounts for the purpose of deposits into the Pires and Claramunt accounts.  Although Glikas was prevented from delivering money directly into the Kesten Venus account due to MTB's refusal to accept third party checks, also known as "Cash Letter" deposits, the note demonstrates Glikas intimate knowledge of the Pires account activity by having monies deposited to his nominee Forex Tadeland account for subsequent transfer into the Kesten Venus account.  Glikas would also collect and return checks to Pires that did not clear for deposit due to insufficient funds.

---

[2] The Real is the monetary unit of Brazil.

22

50.    To transfer the smuggled drug proceeds to Pires and Claramunt, Glikas via his money laundering organizations used several bank accounts, including the following:

A. The "Venus account" maintained by the Kesten Development Corp. at MTB Bank (hereinafter "Kesten Venus") controlled by Antonio Pires de Almeida, a/k/a "Pires";

B. The "Tadeland account" held in the name of Kreismer Juan Bielic maintained at Foreign Exchange Trade Associates, Inc., a/k/a "FOREX" (hereinafter "Forex") at E.A.B. Bank;

C. The "Lisco account" held in the name of Antonio Claramunt, a/k/a "Tonino", maintained by Beacon Hill Money Remitter (hereinafter "Beacon Hill") at Chase Manhattan Bank[3]; and

D. The "Ramal Venture account" held in the name of Estaban Bernal with Marcos Glikas as Attorney-in-Fact, maintained at Israeli Discount Bank (hereinafter "IDB").

The defendant funds were seized from these accounts pursuant to warrants executed in January, 1999.

The following describes how the laundered drug proceeds where deposited into, and transferred among, these four accounts.

51.    Pires is the principal in Kesten Development Corp. which maintained the Venus account at MTB Bank.  Early in his relationship with Pires, Glikas caused Cash Letter deposits derived from the smuggled drug proceeds to be deposited directly into the Venus account.  In the mid-1990's, however, MTB began to express concerns about the volume of these kinds of

---

[3] The $11,534.79 seized from this account on January 13, 1999 was administratively forfeited by the Drug Enforcement Administration since no claim and cost bond was filed by the account holder.

deposits being deposited into the Venus account and the compliance and oversight problems they were creating. In numerous internal memos, MTB bank expressed concerns about money laundering with Pires and the Venus account. Pires repeatedly tried to quell MTB's concerns by assuring the bank that he knew his clients and the ownership of the funds. Specifically, on or about May 8, 1997, Pires told bank officials that "he works only with well known customers." Bank officials noted, however, that there were numerous credit and compliance risks associated with this activity, and concluded that Pires was probably clearing money for other dealers, and thereby distancing himself from the true owners of the funds.

52.     On or about September 24, 1997, MTB officers met with Pires and three of his partners to discuss MTB's decision to stop accepting Cash Letter deposits. During the meeting, Pires and his partners all indicated that they deal only with well known clients and assured the MTB officers that they "scrutinize transactions and clients carefully, and understand that business must be transacted very carefully nowadays." The bank was not persuaded by Pires' efforts, and refused to reinstate the acceptance of Cash Letter deposits into the Kesten Venus account.

53.     The decision by MTB Bank not to accept Cash Letter deposits caused Pires and Glikas to find a different method of getting the money into the Venus account. Thus, in late 1997 and early 1998, they established the practice of having the third-party checks deposited into other accounts, and then transferring the money by wire to the Venus account. Among the accounts that Glikas and Pires used for this purpose were the Tadeland account at Forex, the Lisco account at Beacon Hill, and Ramal Ventures account at Israel Discount Bank (hereinafter "IDB"). By using the Forex, Beacon Hill and IDB accounts, Pires was able to get the funds into

the financial system and ultimately into the Kesten Venus account in a way that was acceptable

to MTB Bank officials who had been concerned about money laundering. Pires had originally

been with MTB from 1977 through 1985, when, due to compliance issues concerning the way the

account was being funded, moved to a money remitter in New York City named Piano

Remittence also known as PIC banking. After Piano Remittence was closed due to a DEA

money laundering investigation, Pires returned to MTB under the bank's terms. An internal

MTB bank memo dated July 13, 1995 noted discussions with Pires regarding compliance issues

including money laundering. Pires knew that the only acceptable forms of deposits were from

checks and wire transfers, not cash. Later as stated above, Cash Letter deposits were also

excluded due to money laundering concerns by the bank.

     54.     The bulk of the Glikas money was deposited into the "Tadeland" account at

Forex. Forex regularly processed in excess of ten thousand checks per month on behalf of the

Tadeland account which was purportedly owned by an individual named Kreismir Juan Bielic

(hereinafter "Bielic"). Bielic, however, is a nominee. The true owner of the Tadeland account is

Pires. Money launderers routinely employ both layering methods and the use of nominee owners

to further conceal or disguise the nature, location, source, ownership, or control of the proceeds

of a specified unlawful activity.

     55.     The second most-frequently used account was the Lisco account at Beacon Hill.

The Lisco account belonged to Claramunt, a/k/a "Tonino", whose business was called Lisco

Overseas. The Lisco account was held at Beacon Hill, a storefront money remitting business in

New York, that is owned and operated by Anibal Contreras and Martha Conde. Beacon Hill was

responsible for remitting hundreds of millions of dollars in 1998 alone. Contreras is listed as

President and Martha Conde is listed as the Vice President of Beacon Hill. (Attached at Tab A and incorporated herein is the Affidavit of Special Agent Christopher Roberts concerning the historical activities of Anibal Contreras and Martha Conde)

56.     Analysis of deposits into the Lisco account at Beacon Hill indicates that in addition to third party checks, numerous sequentially numbered travelers checks were purchased from banks located in South America (See paragraph 69). As part of the ongoing money laundering operation these checks would be purchased with smuggled drug proceeds for subsequent deposit. The Glikas organization then used the Lisco account to launder the checks through Beacon Hill before transferring the money to the Kesten Venus account at MTB. These transfers occurred both directly and indirectly into the Kesten Venus account providing an additional layering mechanism to further disguise the nature of the drug proceeds. Shortly after Glikas' arrest in April, 1998, the Lisco account at Beacon Hill had a significant reduction in transactions with all activity ceasing by October 1998.

**D. Analysis of Seized Accounts for the Time Period of January 1998 Through April 1998**

57.     As mentioned above, the checks smuggled by the Glikas money laundering organization out of Brazil into the United States were ultimately deposited into the Kesten Venus account after being layered through the three other accounts. Amaral, in a post arrest statement on April 25, 1998, stated that upon his entry into the United States he would deliver the checks to three locations: MTB Bank at 90 Broad Street, Forex at 310 Madison Avenue and Beacon Hill at 226 E. 54th Street in New York City. Amaral further stated that, after turning over these checks to MTB, Forex and Beacon Hill, he would never receive any receipts, thus avoiding any paper

trails. Likewise, documents reveal that the Kesten Corp. requested MTB to destroy all bank statements for the Venus account  and that any unpaid checks would be picked up.  The practice of destroying financial statements and controlling access to documents is frequently used by money launders in order to limit their paper trail and thus avoid detection.  When Ricardo Amaral and Marcos Glikas were arrested at John F. Kennedy Airport for their money laundering activity, Glikas was in possession of unpaid checks that had been picked up at Forex concerning the Tadeland account, which is a nominee account owned by Kesten.

58.    As mentioned, between January 6, 1998 through April 24, 1998, Amaral made 13 trips to the United States and declared $23,329,041.00 dollars in the form of personal checks, cashier checks, money orders and traveler checks.  Of these funds, $13,443,778.84 was deposited to the Forex Tadeland account, $5,546,392.91 was deposited to the Beacon Hill Lisco account, and $905,733.69 was deposited into the IDB account.  The sum total of all deposits into the Forex Tadeland account, Beacon Hill Lisco account and IDB account equaled $19,895,905.44, or approximately 85.3 percent of the amount transported into the United States by Amaral.  In each instance Amaral declared the checks on his own behalf or that of Glikas'.

59.    As previously set forth, the Forex Tadeland account received approximately $13,443,778.48 into the account between January 1998 through April 1998 from deposits made by Amaral.  During the same time period the Forex Tadeland account wire transferred approximately $24,149,444.45 into the Venus account at MTB Bank.  The sum of money carried into the United States and declared by Amaral from January of 1998 to April of 1998 which was deposited into the Beacon Hill Lisco account was $5,546,092.91.  In turn, $4,015,522.00 was sent to Kesten Venus at the MTB Bank.  Of the $905,733.69 deposited into the IDB account by

Amaral, $20,000.00 was also sent to Venus. All together, from January to April of 1998, a total of $25,765,344.51 was transferred into the Kesten Venus account at MTB from the three depository accounts seized in this case.

60.    In addition to this sum, Pires received into the Venus account other funds that were first deposited into the Lisco account, wire transferred into other accounts at MTB, and then internally "book transferred" into the Kesten Venus account. For example, on March 17, 1998, the Beacon Hill Lisco account wired $156,924.00 into an account at MTB bank by the name of Jazz. That same day, Jazz performed an internal transfer at MTB into the Kesten Venus account in the amount of $227,160.00. Additionally, on March 18, 1998, the Beacon Hill Lisco account wired $119,221.00 into the Jazz account at MTB Bank. On that same day Jazz performed an internal transfer to the Kesten Venus account in the amount of $100,000.00. Also, on April 24, 1998, the Beacon Hill Lisco account wired $93,532.16 into the Jazz account at MTB Bank. On that same day Jazz performed an internal transfer to the Kesten Venus account in the amount of $95,100.00. This activity is evidence of the layering of accounts to further remove and shield the illegal proceeds from its original illegal source.

61.    Between January 1998 and April 30, 1998, the Beacon Hill Lisco account wire transferred $5,827,837.50 into the Jazz account at MTB Bank. During the same time period, analysis of the Kesten Venus account reveals that the MTB Jazz account made 34 internal book transfers into the Kesten Venus account totaling $6,697,680.49. This layering further helps to hide the source and ownership of the drug proceeds.

62.    All activity in the Lisco account ceased following the arrest of Glikas.  All together Lisco directly or indirectly through Jazz, wired approximately $9.8 million between January 1998 and April 30, 1998 into the Kesten Venus account.

63.    An analysis of the Beacon Hill Lisco account reveals that it was also wiring money to numerous other accounts at MTB Bank which would ultimately end up in the Kesten Venus account.  For example, from January 1998 to April of 1998 the following funds were transferred from the Lisco account to the following accounts at MTB Bank:

| Account Name | Amount |
| --- | --- |
| Azteca Financial Corp | $2,251,527.70 |
| Newland | $   935,946.24 |
| Solid Financial Corp. | $   421,023.00 |

64.    An analysis of the Kesten Venus account revealed that for the period of January 1998 through April 1998, the following companies book transferred funds into the Venus account at MTB Bank:

| Account Name | Amount |
| --- | --- |
| Azteca Financial Corp | $2,907,944.00 |
| Newland | $   865,218.00 |
| Solid Financial Corp. | $    65,094.00 |

65.    An analysis of 25,192 wire transfers and 2,618 internal book transfers into the Venus account between January 1997 through January 1999 reveals an average monthly credit of $35,980,767.92. After Glikas was arrested on April 28, 1998, Pires continued to fund the Venus

account in amounts equal to or greater than before Glikas and some of his associates were arrested. The following is a summary of post-arrest deposits into Venus:

| Month | Credit |
|---|---|
| May-1998 | $38,402,873.27 |
| June-1998 | $36,423,984.53 |
| July-1998 | $38,998,025.89 |
| August-1998 | $41,041,274.37 |
| September-1998 | $38,481,453.01 |
| October-1998 | $48,398,243.22 |
| November-1998 | $41,729,639.71 |
| December-1998 | $52,510,865.18 |
| January-1999 | $18,548,665.41 |

66.    After Glikas' arrest, Pires used other couriers to fund the Venus account to continue his money laundering activity.

67.    After Glikas' arrest, Pires received information that the Venus account was under investigation by the DEA for money laundering.

68.    On January 10, 1999, Pires traveled to the United States to open new money laundering accounts under shell corporation names to continue his illegal activities. On this same date, Pires transported approximately $2.7 million in checks into the United States.

69.    During Pires' operation of the Venus account it never went below $250,000 and the Tadeland account never went below $169,748.37. This continued after the date when Glikas

30

was arrested through January 13, 1999, when the funds were seized. These funds are directly traceable to Glikas and are drug proceeds Pires caused to be deposited into the account and were used by him to facilitate the continued money laundering activities of all funds in the Venus account.

70.     Shortly after the civil seizure of the approximately $8.2 million, Pires opened three new accounts held in the names of shell companies. The first account, in the name of "Sorabe," was opened on February 1, 1999, two weeks after the $8.2 million seizure; the "Harber Corporation" account was opened on August 11, 1999; and the "Gatex Corporation" account was opened on March 29, 2000. Communication between the bank and these shell companies was largely by fax, and the fax number was that of Turist-Cambio, in Brazil, the company of which Pires is the "duly appointed representative."

71.     On June 26, 2002, the Government filed a criminal complaint, United States v. Maria Carolina Nolasco and Turist-Cambio Viagens E Turismo, Ltda,, Mag. No. 02-3090, alleging income tax evasion, money laundering, structuring, and illegal money transmitting. In particular the complaint charges that Turist-Cambio operated accounts at Merchants Bank in violation of 18 U.S.C. § 1960.   According to the criminal complaint, during the period from May 4, 2001, through December 31, 2001, the deposits into Harber, Sorabe, and Gatex totaled $175,950,281.52 and the withdrawals totaled $176,963,499.87. These new accounts were used to conduct a large portion of the illegal money transmitting business alleged in the criminal complaint. These funds are subject to both civil and criminal forfeiture. The investigation is continuing as to this aspect of Pires illegal activity, and it is clear that these new accounts were used to continue the flow of money that Pires had previously moved through the Venus accounts.

31

72.     On June 27, 2002, the United States Customs Service seized over $1.6 million from Harber with an additional $37,765 in after deposited funds. The total seizure to date is $1,698,878.23. Additionally, over $1.7 million was seized from Gatex with an additional $888,771.95 in after deposited funds. The total seizure to date is $2,674,835.39,.

73.     Over nine hundred entities that Pires transacted money for through the Venus account until it was seized were then serviced by Pires through his new shell corporate accounts known as Harber Corp., Gatex Corp., and Sorabe.

74.     The analysis of the Venus, Harber, Gatex, and Sorabe accounts clearly depicts an ongoing operation and conspiracy to facilitate money laundering in direct violation of US and Brazilian laws as well as to facilitate making exchanges of money through the unregulated Black Market which has been consistently shown to include massive amounts of narcotics monies which continued after Glikas' arrest through the seizure of the most recent Pires accounts at Merchants Bank.

75.     On September 25, 2003, the Government unsealed an indictment dated March 8, 2001, which was a result of a Drug Enforcement Administration money laundering investigation. The grand jury returned an indictment against Pires, Crim. No. 01-161 (the "Pires Indictment"), together with two codefendants, Raoul Srour and Flavio Suarez, for conspiracy to launder the proceeds of narcotics trafficking during the period from February 1998 to on or about April 2, 1998. The Pires indictment included forfeiture allegations seeking the forfeiture of all funds involved in the offense, as well as substitute assets. These funds included—but were not limited to—the currency named in the Verified Complaint. The Pires indictment was sealed until the

32

arrest of any one of the defendants.  None of the defendants were in the United States, and none have been arrested.

76.     Beginning in late 1997, Pires directed Glikas to utilize a Beacon Hill account, among others, to move funds into the Venus account.  Beacon Hill was indicted on June 26, 2003, by the Manhattan District Attorney's Office in People of the State of New York v. Beacon Hill Service Corporation, Ind. No. 3615/2003.  It has been charged with a violation of Banking Law § 650(2)(b)(1), engaging in the business of receiving money for transmission without a license.  This charge is similar to 18 U.S.C. § 1960, operating an unlicenced money transmitting business.  The investigation revealed that since 1994, Beacon Hill received and transmitted funds from numerous sources, including individuals, shell corporations, and South American exchange houses known as "casas de cambio."  The money was moved to and from Beacon Hill by wire, check deposits, and drafts.  During 2001 and 2002, wire transfers for just four of Beacon Hill's 40 customer accounts totaled more than $3.2 billion.  In sum, Beacon Hill has been indicted for engaging in an unlicenced money transmitting business through, among others, the very account that was used to layer part of the seized $8.2 million into the Venus account.

77.     On May 12, 2003, the Central Bank of Brazil revoked Turist-Cambio's license to operate as a currency exchange business because of suspicious financial transactions which are being investigated by the Counsil for the Control of Financial Activities (COAF)

78.     The Brazilian Federal Prosecutors are currently investigating Pires and Maria Carolina Nolasco for among other crimes, maintenance of illegal accounts abroad, illegal money transfers through off-shore and shell companies, money laundering, and tax evasion.

79.     Also seized during this case was $5,063.16 from the Ramal Ventures account owned by Glikas and located at Israeli Discount Bank.  This account was operated in furtherance

33

of his money remitting and brokerage activities in violation of Title 18, United States Code, Section 1960, for his clients in Brazil, as well as violations of Title 18, United States Code, Sections 1956 and 1957. Additionally this account was also funded by his ill gotten money laundering gains.

80.    Analysis of some of the wire transfers concerning the Beacon Hill Lisco account and the Kesten Venus account reveal ties to narcotics traffickers and other money laundering activity. (Attached hereto and incorporated herein is the Affidavit of Special Agent Christopher Roberts  as to this activity.)

81.    Kesten is not a licensed money remitter or bank in the state of New York. Kesten's parent company Turist-Cambio Viagens e Turismo Ltda. had its money exchanger license revoked in Brazil. Kesten remits payments from New York both domestically and internationally. Prior to the seizure of the Kesten Venus account, Kesten did not seek to determine from the New York State Banking Authority or others whether their operation was required to be licensed to conduct the remitting services they were performing. Additionally, by the nature of the activity in the Kesten Venus account, Kesten is also operating like a bank without a license or charter to act in that capacity. By not being licenced as a remitter or bank Kesten avoided direct oversight by State and Federal authorities concerning money laundering issues and "Know Your Customer" requirements. Kesten was aware of these money laundering concerns and client issues as evidenced by MTB bank memos documenting discussions with Pires which lead to the refusal of MTB to accept Cash Letter deposits.

### E. Analysis of Third Party Checks

82.    Approximately 31 interviews were conducted with persons having had checks transacted through the various seized accounts. The interviews revealed that each check

34

discussed had irregularities involving either the issuance of the check, addresses on the checks, or transactions involving the checks. Some of those persons interviewed stated that the individuals listed on the checks never lived in the locations where the monthly statements were being sent. Some account holders stated that they had no idea how the accounts were funded. Others said that they would return the monthly statements to the post office as addressee unknown. Other checks had addresses on them that did not exist. In not one interview did it appear that the check was drawn on a normally maintained personal account with routine activity or correspondence.

83.    An analysis of 4,856 travelers checks, totaling $439,780.00 deposited into the Beacon Hill Lisco account between January 29, 1998 and February 28, 1998 reveals that there were 33 series of 20 or more sequentially numbered travelers checks totaling $134,151.00. For example, one series of Citicorp travelers checks was a string of 402 sequentially numbered checks totaling $40,200.00. The total amount of sequentially numbered travelers checks in the 33 series of checks comprised approximately 28.85% of the 4,856 travelers checks deposited into the account during that one month period. The value of the 33 series of sequential checks totaling $134,151.00 represents 30.5% of the $439,780.00 deposited into the account during the one month period. The sequentially numbered checks indicate that they were purchased at one time by the same individual and then all endorsed over at the same time for payment to the same payee. The large dollar amount of checks being purchased and then endorsed over to the same payee is not indicative of routine, legitimate activity associated with travelers checks. But rather the conversion of drug money into travelers checks is commonly employed as a anti-detection tool by money launders. Once purchased with narco-dollars the travelers checks can be deposited into financial institutions without detection by law enforcement officers.

35

## IV. CLAIM FOR FORFEITURE

## COUNT I

84.    Incorporated herein and made part of hereof are allegations contained in paragraphs 1 through 83 of this Complaint.

1.    Title 18, United States Code , Section 1956, commonly known as the "money laundering" statute, imposes a criminal penalty on any person who knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ---

      (A)    (I) with the intent to promote the carrying on of the specified unlawful activity; or ...

      (B)    knowing that the transaction is designed in whole or in part ---

      (C)    to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity ....

2.    The term "financial transaction" means "a transaction ... involving one or more monetary instruments." Title 18, United States Code, Section 1956(c)(4).

3.    A "Specified unlawful activity" is defined in Title18, United States Code, Section 1956(c)(7), and, by reference, incorporates the offenses listed in Title18, United States Code, Section 1961(1).

4.    It is an offense under Section 1956(h) to conspire to commit an offense described in Section 1956 or 1957.

5.    By reason of the above, the defendant currency became and is, subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981 because there is probable cause to believe that it is property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956 or represents property traceable to such property.


WHEREFORE, plaintiff prays that due process issue to bring the defendant currency within the jurisdiction of the Court by arrest; that notice issue to all parties in interest to appear upon the return day of such process and duly intervene herein by claim and answer; that the defendant currency be condemned as forfeited to plaintiff; that an Order for the proper disposal of the defendant currency be issued; and that the costs of seizure incurred by the United States Marshal be taxed to any party or parties opposing forfeiture and that this Court grant plaintiff such further relief as it may deem just and proper in this action.


## COUNT II

85.    Incorporated herein and made part hereof are allegations contained in paragraphs 1 through 84 of this Complaint.

1.    Title 18, United States Code, Section 1957, also known as a money laundering crime, imposes a criminal penalty on any person or persons who knowingly engage or attempt to

engage in a monetary transaction in criminally derived property that is of greater value than $10,000 and is derived from specified unlawful activity.

2.        The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, or funds or a monetary instrument by, through, or to a financial institution. "Criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense.

3.        By reason of the foregoing the defendant currency is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981 because there is probable cause to believe that it is property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1957 or represents property traceable to such property.

4.        It is an offense under Section 1956(h) to conspire to commit an offense described in Section 1956 or 1957.


WHEREFORE, plaintiff prays that due process issue to bring the defendant currency within the jurisdiction of the Court by arrest; that notice issue to all parties in interest to appear upon the return day of such process and duly intervene herein by claim and answer; that the defendant currency be condemned as forfeited to plaintiff; that an Order for the proper disposal of the defendant currency be issued; and that the costs of seizure incurred by the United States Marshal be taxed to any party or parties opposing forfeiture and that this Court grant plaintiff such further relief as it may deem just and proper in this action.

38

Dated: Newark, New Jersey

October 7 , 2003

JOHN ROTH
Chief, Asset Forfeiture Money
Laundering Section


By
STEFAN D. CASSELLA
Assistant Chief, Asset Forfeiture
Money Laundering Section

CHRISTOPHER J. CHRISTIE
United States Attorney for the
District of New Jersey
Attorney for Plaintiff


By:
PETER W. GAETA
Assistant United States Attorney

39

## VERIFICATION

STATE OF NEW JERSEY   )
COUNTY OF ESSEX)

CHRISTOPHER D. ROBERTS, being duly sworn, deposes and says that:

I am a Special Agent with the Drug Enforcement Administration and have been assigned the responsibility for investigating the alleged violations in the within action. I have read the foregoing Amended Verified Complaint for Forfeiture and the statements contained therein are true to the best of my knowledge, information and belief. The source of my information and the grounds for my belief are official records and files of the United States and information obtained by me and others during this investigation.

CHRISTOPHER D. ROBERTS
Special Agent
Drug Enforcement Administration
Newark, New Jersey

Sworn and subscribed to
before me this 17 day
of Oct , 2003

PETER W. GAETA
Attorney at Law
State of New Jersey.